**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

TAÍNA LYONS,

       Plaintiff,                          **COMPLAINT**

       -against-                        Case No. 1:25-cv-08689 (AT)

DISCALCED, INC.,
(DBA "MARK MORRIS DANCE GROUP")      Jury Trial Demanded
And MARK MORRIS, individually,

       Defendants.

-----------------------------------------------------------------x

Plaintiff Taína Lyons, by and through counsel, for her Complaint against Defendants Discalced, Inc. and Mark Morris allege as follows:

## INTRODUCTION

1.     Mark Morris, founder and Artistic Director of the world renowned Mark Morris Dance Group ("MMDG"), has spent decades degrading his Black staff and subjecting them to racial slurs with impunity. He has called his Black dancers the N-word, sexually harassed and assaulted them, demeaned their hair, placed them in physically dangerous scenarios that unreasonably increased their risk of injury, made light of their injuries and their pain, and then held their injuries against them – essentially  using their bodies and then tossing them aside once they're injured and no longer of use to him.

2.     This is the story of a world-famous choreographer whose pattern and practice is to abuse, harass, discriminate and retaliate against Black dancers, and of how this pattern and practice impacted Afro-Latina dancer Taína Lyons during her time with MMDG.

3.     MMDG holds itself out as a deeply compassionate nonprofit organization and a champion of diversity, equity and inclusion, boasting the following "core values" online:

We listen, respond, and collaborate as active members of our diverse community and foster a sense of belonging. We welcome all. […] **Dedicated to equity and diversity**, we strive to remove barriers that prevent **historically excluded populations** from working, learning or dancing with us. We create equitable and inclusive music and dance experiences for all.[1]

4.      MMDG further boasts:

We believe in the power of dance and the performing arts to **unite and uplift without barriers**. Building on our core values of Community, Access, Excellence, and Creativity, **we continue to take actions that advance anti-racism**, accessibility, equity, and inclusion across our organization. We do this as part of **confronting our status and history as a majority white-led institution**, and to address **our role in the systemic racism, prejudices and biases that have long prevailed in the dance community.[2]**

5.      But according to Ms. Lyons and other dancers of color, MMDG is not the anti-racist organization it claims to be. On the contrary, Mark Morris runs his eponymous Dance Group with a toxic blend of open racism, sexism, and glib disregard for the safety and wellbeing of his dancers.

6.      Ms. Lyons stands up for her rights and the rights of all dancers, but especially dancers of color, who are particularly vulnerable to this type of abuse.

7.      This case is brought to remedy violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 (Title VII), the Americans with Disabilities Act (ADA), the Family and Medical Leave Act (FMLA), The New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL).

## PARTIES

8.      Ms. Lyons is a resident of California and currently resides in Los Angeles, California. She is a citizen of California. During her employment as a company dancer with MMDG, she toured internationally with the company and also worked and performed for MMDG in both Manhattan and Brooklyn.

---

[1] *https://markmorrisdancegroup.org/our-core-values/* (last visited Oct. 20, 2025).
[2] *https://markmorrisdancegroup.org/our-commitment-to-idea/* (last visited October 6, 2025).

9.    Discalced Inc. is a New York domestic company registered in the county of New York, to the address 425 Park Avenue, New York, New York, 10022. Discalced, Inc. does business as Mark Morris Dance Group ("MMDG"), an international, touring modern dance company which performs in Manhattan, Brooklyn and throughout the world. It also provides dance classes at the Mark Morris Dance Center, located at 3 Lafayette Ave, Brooklyn, NY 11217.

10.    At all times relevant, Mark Morris was/is a resident of Manhattan, in New York County, New York. Mr. Morris is the founder, artistic director and choreographer of MMDG. According to the MMDG website, the New York Times has called Mr. Morris "the most successful and influential choreographer alive."[3]

11.    At all times relevant, Defendants were and are employers engaged in industry affecting commerce within the ambit of Section 1981 and an employer within the meaning of all federal, state and local statutes under which Ms. Lyons brings her claims.

12.    The Defendants named here (Discalced, Inc. and Mark Morris) acted in concert with one another and constitute part of the same overall enterprise, such that the acts of each are the acts of all. This Complaint collectively refers to all Defendants as "MMDG."  A reference to "MMDG" should be deemed a reference to all Defendants, unless specifically stated otherwise.

<u>**JURISDICTION AND VENUE**</u>

13.    This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332 and 1343.  The amount in controversy, excluding interests in costs, exceeds $75,000. In addition, there is complete diversity of citizenship; this action raises claims under various federal civil rights statutes, and the city and state law claims are so related to

---

[3] *https://markmorrisdancegroup.org/the-dance-group/mark-morris/* (last visited Sept. 26, 2025).

Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution (see 28 U.S.C. § 1367).

14.    This Court has personal jurisdiction over Defendants, and venue is proper in the Southern District of New York, as Defendant Mark Morris resides therein, and certain acts, omissions and events giving rise to this case occurred therein.

## STATEMENT OF FACTS

### I.    Early Success & Promotion

15.    Taína Lyons is an Afro-Latina woman and a professional dancer who worked for MMDG for two years and seven months.



16.    Ms. Lyons started dancing at a very young age, and earned scholarships from the Alvin Ailey American Dance Theater. She graduated from NYU in 2020 with her BFA in dance and a minor in Spanish.

17.    On November 14, 2021, she auditioned to become an apprentice dancer for MMDG, a renowned modern dance company founded in 1980.

18.     On November 16, 2021, Company Director Sam Black emailed Ms. Lyons to offer her the position. She was the only dancer to be hired of the 350-400 auditioning dancers.

19.     Ms. Lyons's first day at MMDG was January 20, 2022.

20.     She immediately excelled in her apprenticeship. Within a couple months, she got a positive mention, by name, in the New York Times.

21.     After six months of apprenticeship, MMDG founder and Artistic Director Mark Morris personally promoted her from apprentice to full Company member.

22.     The Company doctor at that time, Dr. Horowitz, told her when he came to give out COVID boosters that he believed she was the only dancer in the history of MMDG to progress this quickly.

23.     In her first year at the Company, Ms. Lyons performed in 10 separate dances and understudied many more, which was unheard of at MMDG.

**II.     Race-Based Comments & Disparate Treatment**

24.     At 22, Ms. Lyons was the youngest dancer in the Company, as well as the first-ever Latina and the second-ever Black female dancer in the Company's 20+ year history.

25.     She was also the only Black female dancer in the Company at that time, out of about 14 total dancers.

26.     When she first joined the Company, there were two other Black dancers (both of whom were male).

27.     One of them, Malik Williams, withstood years of being undervalued and passed over for roles, culminating in Mr. Morris shoving him in the hallway. Mr. Williams resigned shortly thereafter.

28.    After Mr. Williams resigned, Ms. Lyons was one of only two Black dancers, out of about 14 total dancers. MMDG's leadership was entirely White.

   

Mark Morris        Nancy Umanoff        Sam Black        Julia Weber

  

Jenn Rossi        Elizabeth Fox        Elise Gaugert

29.    After Ms. Lyons's first couple of months with the Company, Director of People and Culture Rebecca Hunt resigned. After that, the Company had no HR personnel for almost two years.

30.    This lack of HR was deeply problematic, as Mr. Morris had a pattern and practice of mistreating dancers of color, and especially Black dancers. While he was sometimes tough on dancers of all races, he singled out dancers of color for especially harsh and antagonistic treatment.

31.    For example, during Ms. Lyons' first eight months, Mr. Morris was on probation, by order of the Board of Directors, for his long history of racist remarks.

32.     At the time, Ms. Lyons did not yet know the reason for this probation, but she later learned about it from speaking with prior members of the Company who had witnessed Mr. Morris's casual use of the N-word during rehearsal.

33.     According to witness Charlton Boyd, a Black man and former longtime MMDG company dancer, Mr. Morris repeatedly called him the N-word in rehearsals and other group settings, sometimes in front of Managing Director Nancy Umanoff, who did nothing to stop it.

34.     According to Mr Boyd's signed witness declaration:

14. Some time after that, Mark Morris began to openly call me "nigger" on a regular/daily basis.

15. He did this at rehearsals and in other group settings, in front of other dancers, musicians and administrative staff – including Executive Director Umanoff, who did nothing to stop it.

16. For example, at times he would smile and say: "Hey nigger."

17. Other times, when his mood shifted, he would shout "HEY, NIGGER" at me, in a markedly hostile tone.

18. I told Mr. Morris: "You can't call me that" and said "not I, nor anyone else here would be able to save you from that racist non-sense."

19. But Mr. Morris ignored me and kept calling me "nigger."

20. In around 2006/07, at the start of one of our rehearsals, Mr. Morris shouted out to the company: "When is it ok to use the word nigger?"

21. That is when Michelle Yard, the only African American female dancer in the company, yelled back: "NEVER!"

22. Despite the objections of myself and Ms Yard, Mr. Morris continued to call me "nigger" in the workplace.

23. I remember a costume fitting in front of wardrobe personnel and another dancer or two, with Mr. Morris laughing and telling a story about the renowned African American opera singer Kathleen Battle, and saying how "she really knows how to nigger-up an Aria."

35.    The combination of Mr Morris's racial abuse and then being discarded because of a problem he and the company created made me fear the concert dance world altogether, and I could not, in good conscience, guide any prospective students or young dancers into that extremely toxic environment.

36.    Mr Morris made dance a painful association for me, as opposed to the source of joy it had once been.

37.    I declare under penalty of perjury that the foregoing is true and correct. Executed on July 17, 2025.

---

38.    I affirm this 17th day of July, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

7/17/2025
_____
Executed on

Signed by:
_____
Charlton Boyd

---

35.    Brandon "BJ" Randolph (the only other Black dancer in the Company following Mr. Williams' resignation) confided in Ms. Lyons that during his entire first five years with the Company, he wasn't cast in any dances.

36.    Mr. Randolph also said that Mr. Morris had singled him out for especially harsh treatment, and sexually assaulted him in an elevator.

37.    Mr. Randolph also told MMDG company dancer Malik Williams about this elevator assault, in which Mr. Morris had grabbed Mr. Randolph's genitals. According to Mr. Williams' sworn declaration:

29.    In response, Mr. Randolph said that Mr. Morris "used to be a lot worse." Mr. Randolph then explained that prior to my joining the company, Mr. Morris had grabbed his penis in an elevator.

30.    Certain members of the company also told me that Mr. Morris used to wear a sarong to rehearsal with no underwear, and then flash his penis at the company while making comments like "the elephant's trunk is out!"

40.    Not long after that, when I was passing by Mr. Morris in a theatre hallway on the tour, he shoved me, hard. I was so shocked that I called my mother in tears to vent about what had happened. I could not work for someone who would shove me, so the next morning I resigned.

41.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

8/12/2025

Signed by:

*Malik R. Williams*
9761F86EF79F40B

Executed on                          Malik Williams

38.     Upon information and belief, Mr. Morris also had sexual relationships with some of his company dancers including but not limited to Spencer Ramirez, who left MMDG as a result of his sexual relationship with Mr. Morris.

39.     Upon information and belief, Mr. Morris also made lewd comments to other employees, including receptionist McCall Atkinson, a Black woman.

40.     For example, Mr. Morris pointed to a string of beads Ms. Atkinson was wearing and suggested they were a sex toy by asking her, while pointing to his crotch: "Do they go *inside*?"

41.     According to an employee review on *Glassdoor.com*: "Mark Morris himself is a human resources nightmare and a harassment lawsuit waiting to happen" who uses "sexist, racist and homophobic slurs" and makes "inappropriate comments about [dancers'] bodies."



### Chaotic organization with no clear direction

Anonymous employee

Former employee, less than 1 year    ⊙ New York, NY

✕ Recommend    ○ CEO approval    ✕ Business outlook

**Pros**
Extremely relaxed atmosphere. Nobody clocks your hours, most employees show up at 10:30 in the morning or later wearing sweat pants and tank tops. This is definitely a pro if you are not into a corporate atmosphere, which MMDG absolutely is not.

Fun group of people to hang out with, for the most part a very young crowd of employees and interns barely out of college, so good social atmosphere.

Very low expectations of performance lead to very low stress levels. Pretty rare that anyone gets on you about your work load or productivity. Work/Life balance is amazing; you never work long hours... You barely ever even work 8 hours. Walk in late, leave early, and never worry about your work.

**Cons**
This office is a madhouse with no direction. The management team such as it is has little to no actual managerial experience – be that with other nonprofits, arts organizations, or the corporate world. Work becomes a free-for-all with department heads pulling employees in wildly different directions and the ever present shadow of Mark Morris looming over everyone.

Mark Morris himself is a human resources nightmare and a harassment lawsuit waiting to happen. He is openly lewd and can be heard using sexist, racist and homophobic slurs in the hallway between picking on employees choice of wardrobe and making inappropriate comments about their bodies. Because his name is on the side of the building he is revered as the end-all, be-all of the organization by his staff of yes-man managers.

42.     For example, Mr. Morris continually commented on the buttocks and genitals of one male company dancer, telling him: "I can see your package, it's looking right at me," and other comments to this effect.

43.     On one occasion around March 2022, Ms. Lyons had a new hairstyle with cornrows on the top and loose curls and the bottom:



44.    Mr. Morris suddenly approached Ms. Lyons and Mr. Williams (a Black male dancer) and announced: "I'm pro Black hair," adding: "I have lots of Black friends!"

45.    Mr. Morris's act of targeting her and Mr. Williams for these non sequitur racial comments made her feel uncomfortable, but she tried not to think about it.

46.    After declaring that he had many "Black friends" and was "pro Black hair," Mr. Morris said he liked Ms. Lyons's hairstyle, but warned her that she would need to get his permission before changing her hair style again.

47.    For rehearsals, female Company dancers usually wore their hair in a ponytail, so Ms. Lyons did the same.

48.    But in the fall of 2022, Mr. Morris singled her out in front of the other dancers and told her her hair was "too big" for a ponytail and that she needed to find some way to "keep it smaller."

49.    As the only Black woman in the Company, she was also the only dancer who was not allowed to wear a ponytail, and the only one whose hair was "too big," according to Mr. Morris, and was "a distraction."

50.    The other female Company dancers -- none of whom were Black – had long, fairly straight, ponytails that swung around a lot, but somehow Mr. Morris didn't find that

distracting. Rather, he insisted that Ms. Lyons "big" and curly hair was distracting and needed to be kept in check.

51.     Notwithstanding her success and promotion, Ms. Lyons quickly learned that, as the only Black female dancer in the Company, Defendants placed higher expectations on her than other dancers, and offered her less support.

52.     For example, oftentimes, Ms. Lyons was only provided with one or two rehearsals prior to performing in front of an audience, which was very unusual; other Company members received many more rehearsals and much more time to prepare.

53.     Also, while she understudied many roles, she was the only dancer who never received targeted, one-on-one "understudy rehearsals."

54.     Unlike other dancers, she was generally expected to learn the roles she understudied simply by watching other dancers perform.

55.     This lack of support and preparation was not only disparate and unfair – it was also reckless and dangerous.

**III.   Failure to Accommodate & Workplace Injury**

56.     When Ms. Lyons began working for MMDG she had two pre-existing conditions, Endometriosis and Undifferentiated Autoimmune-Disease ("UD"). Ordinarily, Ms. Lyons does not need accommodations for these conditions, but she made sure that MMDG was aware of her UD diagnosis, which makes her very sensitive to heat, in case she ever needed medical care.

57.     On September 24, 2022, approximately nine months into her employment, Ms. Lyons injured her Achilles tendon during an MMDG performance – which was not especially surprising, given MMDG's continual lack of support and preparation for her, prior to performances.

58.     She was in a tremendous amount of pain and immediately reported her injury to MMDG, and was directed to see the Company's in-house physical therapist.

59.     That same day, after the performance, Company physical therapist Will Zinter diagnosed her condition as a "strained" Achilles.

60.     He told her to reduce her jumping and turning as much as possible, and he advised Mr. Black of this recommendation.

61.     But the Company did not have any understudies traveling with them for this show, so Ms. Lyons had to wrap her foot and perform through the pain the very next day.

62.     Defendants and Mr. Black ignored Mr. Zinter's professional medical recommendations.

63.     Ms. Lyons told Company Director Black that she was in a lot of pain and was concerned about further injury, but he still required her to perform.

64.     A few weeks after Ms. Lyons's injury, in October 2022, Teri Wexler, a close friend of Mr. Morris, taught their Company class.

65.     Ms. Lyons ended up speaking to her about her injury.

66.     Ms. Wexler advised her that "Mark [Morris] hates when people are injured" but counseled her not to be afraid to speak with him about her condition.

67.     When Ms. Lyons assured her she was not afraid of Mr. Morris and had already spoken with him about her injury, she was visibly shocked, and said "good for you," or words to that effect.

68.     At a rehearsal shortly thereafter, Mr. Morris asked the Company: "Does anyone have any questions?"

69.     Ms. Lyons said "I do."

70.     Mr. Morris snapped "no, you don't" and moved onto the next topic. Mr. Morris had never declined to answer any dancer's questions before Ms. Lyons reported her injury.

71.     In late November 2022, about two months after her Achilles "strain," Ms. Lyons was still in constant pain and taking anti-inflammatories.

72.     When Mr. Morris was teaching their Company class, Ms. Lyons told him she could not do all the moves because she was in so much pain.

73.     In response, Mr. Morris snapped: "get used to it."

74.     Ms. Lyons encountered the same attitude from Mr. Black during rehearsal.

75.     Though Mr. Black had agreed that she could just "mark" the jumps in rehearsal instead of fully completing them (per Mr. Zinter's in-house medical advice), Mr. Black would often change his mind mid-rehearsal and insist that she fully complete her jumps, regardless of her injury.

76.     For lack of any HR personnel, Ms. Lyons met several times with Managing Director Umanoff and reported these issues to her.

77.     Ms. Lyons told Ms. Umanoff that dancing through this injury was endangering her health and delaying her recovery, and that she didn't think she should perform in the final show of the season.

78.     Ms. Umanoff grudgingly agreed to remove Ms. Lyons from three sections of the show, out of 10-15 total sections, claiming: "That's the best I can do."

79.     Ms. Umanoff did not offer any other accommodation, including medical leave.

**IV.    First Medical Leave (Achilles Tendon Injury)**

80.     Ms. Lyons was in so much pain that she ended up taking medical leave for about 10 days in December 2022, to avoid further injuring her tendon.

81.     Despite her workplace injury, Defendants never raised the topic of workers' compensation to Ms. Lyons.

**V.    <u>Endometriosis</u>**

82.     Ms. Lyons also suffered from endometriosis, a chronic condition of the lining of the uterus, for many years.

83.     In December 2022, she notified Defendants that she would need medical leave for major pelvic abdominal surgery to treat her endometriosis, as well as a necessary pre-surgery procedure, as recommended by her doctors.

84.     That winter, all dancers had multiple weeks off due to their performance schedule. During this vacation, Ms. Lyons underwent the pre-surgery procedure.

85.     Unfortunately there was a complication and her doctor temporarily prohibited her from physical activity to prevent organ torsion.

86.     When she returned to MMDG, Mr. Black and Ms. Umanoff would only let her participate in classes, but not performances, for the next few months.

87.     Around February of 2023, MMDG receptionist McCall Atkinson formally complained of race discrimination to Ms. Umamoff (as MMDG had no HR personnel at that time).

88.     Ms. Atkinson reported to Ms. Umanoff that MMDG paid White receptionists more than Black receptionists for the same work; that MMDG refused to recognize Black History Month while recognizing other affinity months; that MMDG leadership routinely called Black women, including herself, by each other's names; that Ms. Sahaida and Mr. Morris had been hostile toward her when she guest-danced with the Company.

89.     During this time, certain employees began complaining about MMDG CFO Elizabeth Fox's odd habit of declaring she was White.

90.     For example, when speaking with Black employees or making suggestions to them, regardless of the topic, Ms. Fox would often sniff, in a passive aggressive tone: "But what do I know? I'm just a White woman!"

91.     MMDG employees McCall Atkinson, Bianca Golden and Calvin Rollins all confided in Ms. Lyons that Ms. Fox's continual, off-topic reminders of her status as "a White woman" were inappropriate and sinister.

92.     In group meetings, these and other employees also discussed Ms. Fox's pattern of passive-aggressive racial comments, which seemed especially out of order during Black History Month (February).

93.     Indeed, a year earlier, in the Spring of 2022, MMDG employee Rachel Lee had had a confrontation with Ms. Fox in which Ms. Lee objected to Ms. Fox's continual, passive-aggressive and non sequitur reminders of her status as "*just* a White woman."

94.     MMDG leadership then reprimanded Ms. Lee for having "made [Ms. Fox] cry" by objecting to her passive-aggressive racial comments.

95.     Ms. Fox had continued unchecked with her pattern of reminding employees of color that she was "just a White woman."

96.     In the Spring of 2023, as Ms. Fox was chatting with Ms. Lyons about family, Ms. Fox mentioned that her husband and daughter spoke French, adding that she had difficulty understanding their French conversations.

97.     Ms. Fox capped off her comments by pointedly asking Ms. Lyons: "What do I know? I'm just a *gringa*."

98.     This comment was especially out of place, as *gringa* is a Spanish word (not French) that refers to non-Hispanic (often White) women.

99.     But Ms. Fox knew that Ms. Lyons was Latina (indeed, MMDG's first-ever Latina company dancer), and Ms. Fox apparently felt the need to remind Ms. Lyons of this, while also reiterating that Ms. Fox was White.

**VI.    Surgery & Second Medical Leave**

100.    On March 10, 2023, Ms. Lyons had her surgery.

101.    She went on short term disability leave from MMDG, and her time off was partly subsidized by short-term disability benefits.

102.    The surgery was notably longer than typical for this type of procedure as Ms. Lyons suffered from multiple complications with her digestive tract and gall bladder, requiring her appendix to be removed.

103.    Ms. Lyons returned to work around the week of April 17, 2023, though her recovery was ongoing.

**VII.    New Diagnosis: Torn Achilles Tendon**

104.    Upon her return, she noticed that her Achilles still had not properly healed.

105.    Because of the constant pain, she decided to seek care from her own podiatrist and orthopedist rather than continuing to rely on the Company's in-house medical staff.

106.    Her orthopedist ordered scans of her Achilles — something the Company's physical therapist had not done — revealing that what the Company had diagnosed as a mere "strain" was actually a *tear* in her Achilles tendon which had not healed in the seven months following her injury.

107.    Along with a torn ACL ligament, a torn Achilles tendon is one of the most painful and most dreaded injuries of athletes and dancers.

108.    Ms. Lyons promptly emailed Company leadership about this new diagnosis.

109.    Managing Director Umanoff, who is not a medical professional of any kind, skeptically commented that even a torn Achilles "should have healed by now."

110.    Ms. Umanoff specifically said she did not like that Ms. Lyons saw doctors outside of the Company.

111.    Defendants did not accept Ms. Lyons's orthapedist's diagnosis and pressed her to get a second opinion from Company physician Dr. Weiss, who was not covered by her insurance.

112.    Defendants also required Ms. Lyons to provide two separate notes from her orthopedist, having rejected the first one as insufficient reason to excuse her from an upcoming Jacob's Pillow performance.

113.    The Company did not file a workers' compensation claim for her, even though the MMDG handbook says "Workers' Comp claims will be made by the company for serious injuries, especially those requiring surgery or long-term rehabilitation."

**VIII.**    <u>**More Failure to Accommodate**</u>

114.    In the summer of 2023, Ms. Lyons had many post-surgery pelvic floor physical therapy appointments as well as other medical appointments pertaining to her recovery from abdominal surgery and her torn Achilles tendon.

115.    Ms. Lyons' physical therapist sent a detailed report on her condition and related needs to Company Manager Julia Weber.

116.    On July 9, 2023, Ms. Lyons emailed Company Director Sam Black and Company Manager Julia Weber to emphasize that ongoing physical therapy was critical to her recovery,

and to announce the dates of her upcoming physical therapy appointments and related medical appointments.

117.    While Ms. Lyons requested the reasonable accommodation of one hour per week to attend physical therapy, on multiple occasions, Defendants did not accommodate her requests to attend physical therapy or other medical appointments, despite her communicating the times far in advance.

118.    As a result, Ms. Lyons was not able to attend physical therapy every week as instructed by her doctors.

119.    For example, Ms. Lyons had a post-surgery pelvic floor physical therapy appointment scheduled for July 21, 2023.

120.    Ms. Lyons told Company Director Mr. Black about the appointment many weeks in advance and he initially approved her request.

121.    However, a few days before the appointment, he quietly put her back on the schedule for July 21.

122.    On July 19, 2023 she noticed the change and emailed Mr. Black to remind him about her physical therapy appointment.

123.    Mr. Black sent a reply email stating: "I realize that you let me know about this appointment a few weeks ago, and I really appreciate the forethought and communication. The fact remains that I need the flexibility to change the schedule around as I need to so that we can get this show together."

124.    Mr. Black did not explain why he needed to change the schedule in this particular way, or why other alternatives were not available.

125.    Mr. Black did not permit Ms. Lyons to attend her physical therapy appointment.

126.    Ms. Lyons reported this to Managing Director Umanoff after rehearsal on July 21.

127.    Ms. Umanoff tried to excuse it by saying that Mr. Black was feeling overwhelmed with work.

## IX.    More Race-Based Comments & Disparate Treatment

128.    In the fall of 2023, during rehearsal, Mr. Morris made a racist joke.

129.    Ms. Lyons does not recall the exact substance of the joke, but it had something to do with a Black singer being untalented (not unlike Mr. Morris' comment to Mr. Boyd that Kathleen Battle "really knows how to N— up and aria").

130.    Mr. Morris emphasized the singer's race in his telling of the joke, and made a disparaging comment about Black culture.

131.    Most of the Company members laughed politely at Mr. Morris's joke, but Ms. Lyons did not laugh. Instead, she said "that's not funny."

132.    In response, a White dancer named Dallas McMurray, who was known to be Mr. Morris's favorite, pointedly turned around and made a rude face at her, as if she were being a spoilsport.

133.    Around this time, Mr. Morris again singled Ms. Lyons out in rehearsal and complained again that her hair was "too big."

134.    She asked him what he recommended, and he referred to "a wig."

135.    Ms. Lyons found these comments to be humiliating, demeaning, and racist.

136.    She also found it ironic in light of his prior comments that he was "pro-Black hair" and has many "Black friends."

137.    In or about late September, 2023, Elizabeth Fox, the CFO of MMDG, began emailing Ms. Lyons to say that Ms. Lyons had to repay Defendants' alleged "overpayment" for her short term disability leave.

138.    Ms. Lyons could not understand Ms. Fox's reasoning, so she asked for a meeting to discuss it further.

139.    Instead, on October 5, 2023, Ms. Fox stopped Ms. Lyons in the third floor hallway, on her way into rehearsal, and insisted that she owed the Company over $2,000.

140.    Ms. Lyons was shocked and confused by Ms. Fox's accusation and aggressive demeanor.

141.    Ms. Lyons ended the conversation as quickly as possible because she had to get to rehearsal.

142.    Because Ms. Fox had detained her, Ms. Lyons walked into rehearsal about three minutes late.

143.    Mr. Morris publicly reprimanded her.

144.    Ms. Lyons apologized and tried to explain that Ms. Fox had pulled her aside in the hallway, but Mr. Morris continued to reprimand her.

145.    Late that night, Mr. Black also emailed her to reprimand her, claiming she had been 15 minutes late, which was not true.

146.    After this incident, Managing Director Umanoff told Ms. Lyons that she did not actually owe the Company any money.

147.    Then Ms. Umanoff said: "This one's on me. Just don't ask me for any more favors."

148.    Ms. Lyons did not understand this comment, and clarified that she had not asked her for a favor, especially since she didn't owe the Company any money.

149.    Ms. Umanoff insisted: "I will *never* do this again," and ended the conversation.

150.    Meanwhile, Ms. Lyons continued to struggle through the painful recovery from her pelvic surgery.

151.    On December 15, 2023, Ms. Lyons suffered from such painful pelvic spasms that she was unable to attend rehearsal or even leave her home.

152.    Ms. Lyons told Mr. Black that she would have to take a sick day.

153.    Company member BJ Randolph later called her and asked why she had missed rehearsal.

154.    He told her that other Company members were disparaging her for her absence, despite their knowledge of her surgery and health challenges.

155.    Ms. Lyons told Mr. Randolph that this never seemed to be an issue when other Company members missed work due to illness or injury.

156.    Mr. Randolph agreed that "people call out all the time" without suffering the same repercussions as her.

157.    Mr. Randolph also agreed more generally that Defendants held Ms. Lyons to a different standard and higher expectations than anyone else in the Company.

158.    Mr. Randolph also said: "I'm afraid for you," adding that Ms. Lyons' medical issues might lead Mr. Morris to view her as "unreliable."

**X.    <u>First Discrimination Complaint (to Company Director)</u>**

159.    On December 22, 2023, Ms. Lyons had a one-on-one meeting with Company Director Mr. Black.

160.    Mr. Black said the meeting was an opportunity to talk about what they both could be doing better.

161.    He asked her how her year had been, and she said it had been very challenging given her medical issues and the Company's lack of support for her.

162.    She reported that she felt she had been punished for taking medical leave.

163.    She also explained that she was being held to a double standard compared to other dancers, belittled and singled out for blame.

164.    Mr. Black suggested that Ms. Lyons was a "scapegoat" for various issues at the Company.

165.    He then told her that she was "too defensive" and that she was "just like Domingo."

166.    MMDG dancer Domingo Estrada Jr. was known throughout the Company as combative and argumentative.

167.    Indeed, when Company leadership would criticize Mr. Estrada, he often argued with them and even yelled at them – something Ms. Lyons had never done.

168.    When Ms. Lyons asked Mr. Black to provide an example of her "defensive" behavior, or how she was "just like Domingo," Mr. Black offered that Ms. Lyons would sometimes say "I don't know" in rehearsals when asked about something she had never been taught or didn't know.

169.    Mr. Black also told Ms. Lyons that she needed to be "more vulnerable," that her face was "too stoic" in rehearsals and that she needed to have more "pep" in her facial

expression[4] whenever Mr. Morris was telling a joke or a story in order to "give Mark [Morris] what he needs."

170.    This reminded her of the time when Mr. Morris had told a racist joke and everyone except her had laughed.

171.    Ms. Lyons felt very uneasy about Mr. Black's comments: He had baselessly compared her to the only other Latinx dancer in the company, then subjected her to the "Angry Black Woman" trope[5], all directly after she had reported disparate treatment and retaliation.

172.    A few weeks later, in January 2024, Defendants flew Ms. Lyons and the rest of the Company to Canada to perform "The Look of Love."

173.    On January 19, the rehearsal studio was extremely hot and made her feel ill, as her Undifferentiated Autoimmune-Disease ("UD")  makes her sensitive to heat.

174.    Defendants knew of her UD and resulting heat sensitivity because Ms. Lyons had spoken with Mr. Black, Ms. Umanoff, Mr. Morris and Company Manager Julia Weber about it previously, more than once.

_____

[4] According to the Company handbook: "...Do not dismiss co-workers' mood or demeanor with statements like 'smile,' 'calm down,' 'lighten up,' or 'you should.' Rather, ask if something is wrong and if there is something you can do to help."

[5] See, *Foster v. Dula*, No. 21 CIV. 11224 (CM), 2023 WL 5576693, at *4, *7 (S.D.N.Y. Aug. 29, 2023)(allowing expert testimony on the "Angry Black Woman" trope, on the stereotype that "Black women [are] 'uppity' troublemakers" which had "long been applied to Black women in the workplace."); Trina Jones & Kimberly Jade Norwood, *Aggressive Encounters & White Fragility: Deconstructing the Trope of the Angry Black Woman*, 102 Iowa L. Rev. 2017, 2044, 2057 (2017) ("...these encounters all carry the risk that if a Black woman were to challenge embedded assumptions, the focus would shift from the aggressor's act to the appropriateness of the Black woman's response [and also] risks the all too familiar conclusion: there she goes — that Angry Black Woman! ...In an instant, a Black woman who pushes back against her marginalization gets transformed by society into the 'Angry Black Woman.'... The problem becomes the Black woman as opposed to the conditions to which she is responding. In short, the exercise of voice leads to further stereotyping, backlash, and death by a thousand cuts... Consider the constant stress that countless other Black women face knowing that they risk being labeled an 'Angry Black Woman' and blamed if they speak forcefully or strongly — or if they speak at all.)"

175.    Ms. Lyons told Ms. Weber that she was having a "flare up" of her UD, and she iced her neck and face backstage during breaks.

176.    After a full rehearsal, Ms. Lyons returned to her hotel — a five-minute walk from the theater — to take a cold shower and cool down before showtime.

177.    There was no clear policy about how far in advance of showtime dancers had to arrive, but Ms. Lyons had often seen dancers arrive well after the 30-minute call time without repercussions.

178.    Ms. Lyons generally arrived first among the dancers.

179.    At the 30-minute call time, Ms. Weber called to ask where Ms. Lyons was.

180.    Ms. Lyons told Ms. Weber that she and Mr. Estrada were about a block away and would be right there.

181.    Two minutes later, Ms. Lyons and Mr. Estrada walked into the theater.

182.    Ms. Lyons arrived fully prepared with hair and makeup already done, ready to slip on her costume and go on stage.

183.    Christina Sahaida, a White woman who was Ms. Lyons's understudy, immediately accosted her, called her "girl,"[6] and berated her for her arrival time in front of everyone in the women's dressing room.

184.    Ms. Lyons apologized to the group and explained that she was having health issues. Nobody asked her if she was okay or expressed any concern for her.

185.    Instead, another White dancer, Karlie Budge, joined in criticizing her. Nobody intervened on her behalf.

---

[6] According to the Company handbook: "Use the names and pronouns people use to introduce themselves ...Pet names like 'boy,' 'honey,' and 'sweetheart,' etc. are inappropriate in a professional setting since they reinforce power dynamics and assumptions about others."

186.    Ms. Sahaida then accosted and berated Ms. Lyons two more times before the show started, with no regard for the fact that, unlike Ms. Sahaida, Ms. Lyons was about to go onstage and needed to focus.

187.    Ms. Weber also reprimanded Ms. Lyons, but she did not reprimand Mr. Estrada, who had arrived with Ms. Lyons.

188.    Dancer Matthew McLaughlin told Ms. Lyons that prior to the 30-minute call time, Ms. Sahaida had already taken it upon herself to ask wardrobe for Ms. Lyons's costume so that she could dance her role, which was not Ms. Sahaida's prerogative as an understudy.

189.    Upon information and belief, at least one other Black woman has lodged a formal complaint about Ms. Sahaida's race-based, hostile behavior to MMDG.

190.    When Ms. Lyons returned to New York from Canada, Mr. Black reached out and invited her to talk about the incident with him.

191.    He scheduled their meeting but then deliberately postponed it by a day so he could speak with Ms. Sahaida first, giving her priority over Ms. Lyons, even though Ms.Sahaida had harassed and berated Ms. Lyons in violation of the handbook[7], not the other way around.

192.    During their meeting, Mr. Black openly took Ms. Sahaida's side and interrupted Ms. Lyons repeatedly, refusing to hear her out.

193.    Rather, he would only listen to her White colleague who, unlike her, was not disabled and had not taken any recent medical leave.

194.    Mr. Black took everything Ms. Sahaida had told him at face value and presumed it to be true, while presuming Ms. Lyons's account of the incident to be false.

---

[7] According to the Company handbook: "Shaming, public outbursts, and verbal altercations can be disruptive and threatening to the work environment. These interactions will not be tolerated at MMDG."

195.    Ms. Lyons asked Mr. Black why he was taking this position, and he asked: "What do you want me to do?"

196.    When Ms. Lyons suggested that Mr. Black send a Company-wide email reminding everyone to treat one another respectfully, he immediately dismissed her request, saying he would get "blow back" if he sent an email saying "hey everyone, Taína is angry!"

197.    But Ms. Lyons had not said she was "angry," and she was not asking for an email about her personal feelings.

198.    Nonetheless, Mr. Black treated her as a troublemaker and a stereotypical "Angry Black Woman."

199.    Ms. Lyons told Mr. Black: "This would never have happened if I had been any other dancer" in the Company.

200.    Mr. Black promised her a follow-up meeting but never scheduled it.

## XI.    <u>Second Discrimination Complaint (to HR)</u>

201.    On January 26, 2024, Ms. Lyons met with recently hired HR Business Partner Jessica Loyola to file a complaint about Ms. Sahaida's hostile treatment of her.

202.    Prior to Ms. Loyola's hire, the Company had been without any HR personnel for nearly two years.

203.    Ms. Lyons had met Ms. Loyola prior to this meeting, and Ms. Loyola had been very friendly to her.

204.    However, during this meeting, Ms. Loyola was extremely cold and hostile.

205.    Ms. Lyons prefaced her comments by reminding Ms. Loyola that she was "the only Black woman in the Company."

206.    Ms. Loyola immediately became defensive and snapped, "that's not relevant!"

207.    Ms. Lyons explained that she had been targeted and subjected to a double standard. Ms. Loyola snapped, "that's too vague!"

208.    Ms. Loyola also said that the incident with Ms. Sahaida was a "he said, she said."

209.    Ms. Lyons pointed out that it was not really a "he said, she said" situation because there were numerous witnesses.

210.    Ms. Loyola then began cross examining Ms. Lyons, asking rapidfire questions in a hostile tone.

211.    Each time Ms. Lyons tried to answer Ms. Loyola's questions, Ms. Loyola interrupted Ms. Lyons and refused to hear her out.[8]

212.    Ms. Loyola's resentment was palpable and it seemed clear that her goal was to intimidate Ms. Lyons and shut her up.

213.    When Ms. Lyons said she wasn't sure how to move forward, Ms. Loyola interrupted her to say: "I already have solutions about how to move forward. I'll get back to you."

214.    But Ms. Loyola never followed up with Ms. Lyons, nor did anyone else in leadership.

215.    On January 28, 2024, Ms. Lyons tested positive for COVID.

216.    Ms. Lyons spent the week on medical leave, quarantining and recovering at home before returning to the studio on February 5, 2024.

---

[8] According to the Company handbook: "Be an active listener. Do not interject or speak over others as a method to silence voices or opinions."

217.    Mr. Black removed Ms. Lyons from her leading role in an upcoming dance called "V," saying that even after she was feeling better, he would "not even let [her] rehearse in front of Mark [Morris]."

218.    Other, non-Black dancers had also been on medical leave for COVID during her time with the Company, but Defendants never responded in this fashion.

219.    After benching her from rehearsals, Mr. Black then determined that instead of dancing the lead role, Ms. Lyons would "cover" all 14 roles in "V," for which there were no understudies, in case of emergency.

220.    Ms. Lyons already knew the leading role that she had previously been cast in, but that still left 13 other roles for her to learn — while being banned from rehearsal.

221.    She was not allowed to rehearse, and Mr. Black did nothing to help her learn these 13 roles in the time remaining prior to "V."

222.    Meanwhile, on February 6, Company member Nicole Sabella, a White woman, called out of work a few hours before rehearsal.

223.    Ms. Lyons did not hear anyone disparaging Ms. Sabella for her absence, the way they had disparaged Ms. Lyons for hers.

224.    Ms. Sabella and Ms. Lyons were the only two understudies for the dance "Castor and Pollux."

225.    Mr. Black required Ms. Lyons to run the full dance in rehearsal, despite the fact that she was not performing "Castor and Pollux" that night.

226.    The following week, Company physical therapist Jessica Lassiter told Ms. Lyons that prior to this rehearsal, Ms. Lassiter had already informed Mr. Black on February 5 that "Castor and Pollux" was too strenuous for Ms. Lyons at this stage of her surgical recovery.

227.    Ms. Lassiter expressed shock and dismay that Mr. Black had contravened her medical advice by requiring her to run "Castor and Pollux."

228.    White Company dancer Karlie Budge then injured herself and called out on February 9, meaning Ms. Lyons had to cover her role in "V" that night. (Like Ms. Sabella, Ms. Lyons did not hear anyone disparaging Ms. Budge for her absence as they had disparaged Ms. Lyons for hers.)

229.    Mr. Black had never even allowed Ms. Lyons to rehearse this role before, but she still had to cover Ms. Budge's 25-minute spot in that night's performance.

230.    Mr. Black offered no support. Instead, someone handed Ms. Lyons a laptop with a video of the dance; she only had time to watch it once, and complete a short "spacing" rehearsal, before she had to perform it twice in one night in front of hundreds of people.

231.    During the spacing rehearsal, Mr. Black put no time or focus into adding her into this role for the very first time, and he would not allow her to ask any questions.

232.    Rather, Mr. Black ignored her and focused on the other dancers, who were entirely familiar with their roles and who were not filling in at the last minute.

233.    This was very different from how other MMDG understudies and covers were treated in similar situations involving call outs shortly before showtime: Other understudies and covers in this situation typically received at least one proper "understudy rehearsal" prior to showtime.

234.    Indeed, unlike other company dancers, Ms. Lyons never got proper one-on-one "understudy rehearsals," as Mr. Black had always cancelled them without explanation.

235.    When she would ask him why her understudy rehearsals had been cancelled, he always just said they weren't needed.

236.    Despite this dangerous lack of support or proper preparation, Ms. Lyons somehow managed to perform Ms. Budge's role seamlessly, and without further injuring herself, during that night's two performances.

237.    She received positive feedback on her quick study and show-saving performance from several Company members.

238.    But a week later, on February 13, 2024, Mr. Black emailed Ms. Lyons to reprimand her regarding her February 9 performance of Ms. Budge's role.

239.    He wrote: "While you ultimately delivered a commendable performance, I was surprised and a bit alarmed at the level of preparation evident at the [spacing] rehearsal. I expected you to know the piece better given your role as cover."

240.    Mr. Black knew he had never allowed her to rehearse this role or any of the other 13 roles she was "covering," and that he had not assigned any proper understudies or given her any proper understudy rehearsal, either before or after Ms. Budge had called out.

241.    In other words, he effectively set Ms. Lyons up for failure, and after she succeeded against the odds, he scapegoated her for his poor planning and her White colleague's last-minute callout.

242.    Indeed, Defendants had a pattern and practice of putting Black dancers in this type of high-risk, last-minute assignment.

243.    Witnesses Charlton Boyd and Malik Williams (two Black former company dancers) both describe similar experiences in their witness declarations.

244.    According to Mr. Williams:

15.    During my time at the company, I did more than my fair share of understudying and last-minute covers for dancers who had called out sick or injured, but Mr. Morris never recognized my efforts.

16.    For example, when a female dancer tested positive for COVID just 30 minutes before showtime, Mr. Morris required me to dance her role in the show, even though she was a woman and I was not her understudy, meaning nobody had ever asked me to learn her role and I did not know her role in advance of the show. In other words, Mr. Morris put me in a precarious situation that was also physically dangerous.

17.    From the time of Mr. Morris's announcement to the moment I stepped onstage, I had exactly 30 minutes to get into hair, makeup, and costume, and use an archival video to teach myself this woman's entire role in the dance, from scratch.

18.    Somehow, I managed to do all of this, and I delivered a strong performance in the show that evening. But Mr. Morris did not even acknowledge my efforts, let alone thank me for a job well done.

40.    Not long after that, when I was passing by Mr. Morris in a theatre hallway on the tour, he shoved me, hard. I was so shocked that I called my mother in tears to vent about what had happened. I could not work for someone who would shove me, so the next morning I resigned.

41.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

8/12/2025

_____
Executed on

Signed by:
Malik R. Williams
9791FD8EF79F4CB

Malik Williams

245.    According to Mr. Boyd:

6. Mr. Morris required me to understudy and perform many roles without giving me proper or adequate understudy rehearsal/preparation.

7. For example; in the early 2000s I was made to perform a dance piece that I'd only had one inadequate rehearsal for, months before I was to perform it and coming back from a hip injury, without a proper wardrobe fitting and virtually no stage spacing with the other dancers in the piece.

8. After performing that particular piece, one out of four extremely difficult pieces I was to perform that night, MMDG Executive Director Umanoff stormed into the men's dressing room whilst we were changing for the next dance piece, and in front of everyone, including the musicians, yelled at me: "WHAT WAS THAT – THE HOOD VERSION?"

9. She said I looked like "the hood version" because of my oversized costume that the wardrobe staff had no time to fit me for properly.

10. She suggested that I looked like just another black kid off the street, sagging my pants.

---

38. I affirm this 17th day of July, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

7/17/2025

_____

Executed on

Signed by:

D7509EF0591345B

_____

Charlton Boyd

---

246. Meanwhile, Ms. Sahaida regularly referred to Ms. Lyons as "T,"[9] which made her uncomfortable because they weren't friends. On February 24, 2024, Ms. Sahaida once again referred to her as "T," and she politely asked that Ms. Sahaida call her Taína instead.

---

[9] According to the Company handbook: "Use the names and pronouns people use to introduce themselves."

247.    Ms. Sahaida immediately became irate and accused Ms. Lyons of being upset that she had filled in for her during her medical leave for her surgery.

248.    Ms. Lyons repeatedly tried to de-escalate the conversation and offered to speak later instead, but Ms. Sahaida continued to antagonize her and eventually stormed off to the bathroom.

249.    Another dancer, Courtney Lopes, witnessed the interaction and confirmed that, unlike Ms. Sahaida, Ms. Lyons had remained calm throughout.

250.    Ms. Lyons subsequently reported the incident[10] to Company manager Ms. Weber. Defendants did not follow up at all.

**XII.    <u>Termination</u>**

251.    Around late April, 2024, Ms. Lyons hadn't had a day off in two week and was simultaneously dealing with a flareup of her undifferentiated autoimmune condition when she began to experience intense body pains and vertigo that sent her to urgent care, causing her to miss a rehearsal at the Metropolitan Opera House.

252.    Around mid-May, 2024, Mr. Black announced he would be leaving MMDG that summer.

253.    Ms. Lyons was hopeful that her work environment might improve with the arrival of a new Company director.

254.    But on the morning of May 21, 2024, Mr. Black emailed Ms. Lyons requesting to speak with her later that day.

---

[10] According to the Company handbook: "Shaming, public outbursts, and verbal altercations can be disruptive and threatening to the work environment. These interactions will not be tolerated at MMDG."

255.    After a full rehearsal day and Company meeting, Ms. Lyons was blindsided when Mr. Black led her into HR Business Partner Ms. Loyola's office.

256.    This was the first time Ms. Lyons had seen or heard anything from Ms. Loyola since she filed her discrimination complaint in January.

257.    Ms. Loyola began by saying that Ms. Lyons was an extremely talented dancer and had an excellent stage presence.

258.    Ms. Loyola then said that Defendants were terminating Ms. Lyons "based on the last couple of months."

259.    Ms. Loyola also informed Ms. Lyons that Mr. Morris himself had made the decision to fire her.

260.    Ms. Loyola then asked Ms. Lyons to keep performing with the Company through August 31.

261.    Mr. Black sat silently in the corner and refused to speak to Ms. Lyons at all for the remainder of his time as Director, which was at least five weeks.

262.    MMDG employees on the education team told Ms. Lyons they could not believe she had been fired because she was the Company's "best dancer." Director of Community Engagement Sarah Marcus also said she could not believe Ms. Lyons had been fired.

263.    Ms. Lyons emailed Managing Director Umanoff to ask for a meeting with her and Mr. Morris, but Ms. Umanoff suggested Ms. Lyons meet with her alone.

264.    During this meeting, Ms. Umanoff complimented Ms. Lyons's work repeatedly, calling her "an incredibly talented and beautiful dancer."

265.    Ms. Umanoff added that Ms. Lyons's recovery from her health issues following her medical leave, without compromising the quality of her work, had been "remarkable and heroic."

266.    Ms. Umanoff said Ms. Lyons's termination was "definitely not based on [her] ability as a performer or the way [she] deliver[s] Mark's work to the stage."

267.    Rather, Ms. Umanoff said Mr. Morris felt Ms. Lyons wasn't giving him "muse-like inspiration" because the "magic" wasn't there anymore.

268.    Ms. Lyons told Ms. Umanoff had been treated differently and worse than other dancers, and held to a double standard throughout her time at the Company, and that she had effectively been punished for taking medical leave.

269.    Ms. Umanoff said "that all sucks" and agreed that it was "incredibly toxic" and "horrible."

270.    Ms. Umanoff also repeatedly said that Ms. Lyons's termination was "handled badly."

271.    She ended the meeting by telling Ms. Lyons she would schedule a time for Ms. Lyons to meet with Mr. Morris.

272.    Almost two months later, on July 19, 2024, Ms. Lyons was finally allowed to meet with Mr. Morris.

273.    During this meeting, he mostly talked about himself and how the pandemic had hindered his creative process, without addressing her termination or the reasons for it.

274.    Ms. Lyons told Mr. Morris about her protected activities and disparate treatment leading up to the termination, and she said the termination was unfair.

275.    In response, Mr. Morris said "you're right" and added that Defendants should have treated her more fairly.

276.    Mr. Morris then told her she had always performed his works beautifully and that she would surely be "the best dancer in any Company."

277.    He vaguely added that he might invite her back to the Company at some point in the future.

XIII.    **Damages**

278.    In addition to the loss of income from her termination, Ms. Lyons has endured substantial emotional distress, with physical symptoms, as a result of Defendants actions.

279.    Throughout her time at MMDG through the present, she has been in treatment with a psychotherapist in order to cope with this emotional distress.

**FIRST CAUSE OF ACTION**
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e et seq.**
**Discrimination**
**(Against the Corporate Defendant)**

280.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

281.    At all times relevant, Ms. Lyons was an employee and MMDG was an employer within the meaning and coverage of Title VII.

282.    Ms. Lyons is an Afro-Latina woman.

283.    MMDG discriminated against Ms. Lyons on account of her race by subjecting her to differential terms and conditions of employment, harassing her, subjecting her to a hostile environment, and terminating her employment.

284.    Ms. Lyons' race was a motivating factor or other sufficient causal factor in MMDG's actions.

285.    As a direct and proximate result of MMDG's unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

286.    MMDG's actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Lyons' rights, justifying punitive damages.

287.    Ms. Lyons prays that the Court find MMDG liable for discrimination in violation of Title VII, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

<u>SECOND CAUSE OF ACTION</u>
**Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e, et seq.**
**Retaliation**
**(Against the Corporate Defendant)**

288.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

289.    At all times relevant, Ms. Lyons was an employee and MMDG was an employer within the meaning and coverage of Title VII.

290.    Ms. Lyons engaged in activity protected by Title VII when she, *inter alia*: (a) told Mr. Morris that his racist joke was not funny, (b) reported Ms. Sahaida's behavior to Mr. Black, (c) reported Ms. Sahaida's behavior to HR Business Partner Loyola, and (d) reported Ms. Sahaida's behavior to Company Manager Weber, and (e) told Mr. Morris about her protected activities and disparate treatment leading to her termination.

291.    MMDG took adverse action against Ms. Lyons because of her protected activity. Among other things, MMDG retaliated by subjecting her to differential terms and conditions of employment, harassing her, subjecting her to a hostile environment, and terminating her employment.

292.    Ms. Lyons' protected activity was a motivating factor or other sufficient causal factor in MMDG's actions.

293.    As a direct and proximate result of MMDG's unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

294.    MMDG's actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Lyons' rights, justifying punitive damages.

295.    Ms. Lyons prays that the Court find MMDG liable for discrimination in violation of Title VII, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

### THIRD CAUSE OF ACTION
**Violation of 42 U.S.C. § 1981**
**Discrimination**
**(Against both Defendants)**

296.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

297.    Ms. Lyons is Afro-Latina.

298.    Defendants discriminated against Ms. Lyons on account of her race by subjecting her to differential terms and conditions of employment, harassing her, subjecting her to a hostile environment, and terminating her employment.

299.    Ms. Lyons' race was a motivating factor or other sufficient causal factor in Defendants' actions.

300.    As the founder, artistic director and head choreographer of MMDG, Mr. Morris is individually and directly liable as Ms. Lyon's employer.

301.    Alternatively, Mr. Morris is individually liable for aiding and abetting MMDG in violating Ms. Lyons' federally protected civil rights.

302.    As a direct and proximate result of Defendants' unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

303.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Lyons' rights, justifying punitive damages.

304.    Ms. Lyons prays that the Court find Defendants liable for discrimination in violation of Title VII, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

### FOURTH CAUSE OF ACTION
**Violation of 42 U.S.C. § 1981**
**Retaliation**
**(Against both Defendants)**

305.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

306.    Ms. Lyons engaged in activity protected by 42 U.S.C. § 1981 when she, *inter alia*: (a) told Mr. Morris that his racist joke was not funny, (b) reported Ms. Sahaida's behavior to Mr. Black, (c) reported Ms. Sahaida's behavior to HR Business Partner Loyola, and (d) reported Ms.

Sahaida's racially-motivated hostile behavior to Company Manager Weber, and (e) told Mr. Morris about her protected activities and disparate treatment leading to her termination.

307.    Defendants took adverse action against Ms. Lyons because of her protected activity. Among other things, Defendants retaliated by subjecting her to differential terms and conditions of employment, harassing her, subjecting her to a hostile environment, and terminating her employment.

308.    Ms. Lyons' protected activity was a motivating factor or other sufficient causal factor in Defendants' actions.

309.    As the founder, artistic director and head choreographer of MMDG, Mr. Morris is individually and directly liable as Ms. Lyon's employer. Alternatively, Mr. Morris is individually liable for aiding and abetting MMDG in violating Ms. Lyons' federally protected civil rights.

310.    As a direct and proximate result of Defendants' unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

311.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Lyons' rights, justifying punitive damages.

312.    Ms. Lyons prays that the Court find Defendants liable for discrimination in violation of § 1981, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**FIFTH CAUSE OF ACTION**
**Violation of the Americans with Disabilities Act**
**42 U.S.C. § 12101 et seq.**
**Discrimination**
**(Against the Corporate Defendant)**

313.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

314.    At all times relevant, Ms. Lyons was an employee and MMDG was an employer within the meaning and coverage of the ADA.

315.    Ms. Lyons had a torn Achilles tendon, endometriosis requiring surgery, and Undifferentiated Autoimmune Disease ("UD"), all conditions that qualify as a disability within the meaning of the ADA.

316.    Alternatively, MMDG perceived Ms. Lyons as disabled.

317.    MMDG denied Ms. Lyons's request for reasonable accommodations by forcing her to perform unsafe dances and refusing to allow her to attend her doctors appointments.

318.    MMDG took adverse action against Ms. Lyons based on her disability and/or perceived disability by, *inter alia*, subjecting her to differential terms and conditions of employment, subjecting her to a hostile environment, and terminating her employment.

319.    As a direct and proximate result of MMDG's unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

320.    MMDG's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Lyons's rights, justifying punitive damages.

321.    Ms. Lyons respectfully prays that this Court adjudge MMDG liable for disability discrimination in violation of the ADA, and grant all relief allowed under the law, as set forth in the Prayer in this Complaint.

### SIXTH CAUSE OF ACTION
**Violation of the Americans with Disabilities Act**
**42 U.S.C. § 12101 et seq.**
**Retaliation**
**(Against the Corporate Defendant)**

322.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

323.    At all times relevant, Ms. Lyons was an employee and MMDG was an employer within the meaning and coverage of the ADA.

324.    Ms. Lyons had a torn Achilles tendon, endometriosis requiring surgery, and Undifferentiated Autoimmune Disease ("UD"), all conditions that qualify as a disability within the meaning of the ADA.

325.    Alternatively, MMDG perceived Ms. Lyons as disabled.

326.    Ms. Lyons engaged in activity protected by the ADA when she, *inter alia*, requested reasonable accommodations in the form of (a) minimizing jumping and turning as her Achilles tendon healed, (b) taking medical leave in December 2022 for her Achilles tendon, (c) going on short term disability leave in March 2023 to complete a major abdominal surgery, and (d) attending physical therapy one hour per week in the summer of 2023.

327.    MMDG took adverse action against Ms. Lyons based on her ADA-protected request for accommodations by, *inter alia*, subjecting her to differential terms and conditions of employment, subjecting her to a hostile environment, and terminating her employment.

328.    As a direct and proximate result of MMDG's unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

329.    MMDG's actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Lyons's rights, justifying punitive damages.

330.    Ms. Lyons prays that the Court find MMDG liable for retaliation in violation of the ADA, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**SEVENTH CAUSE OF ACTION**
**Violation of the Family and Medical Leave Act**
**29 U.S.C. § 2601 et seq.**
**Retaliation**
**(Against both Defendants)**

331.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

332.    Ms. Lyons suffered a torn Achilles tendon, endometriosis, Undifferentiated Autoimmune Disease ("UD") and COVID-19, all conditions that qualify as a serious health condition within the meaning of the FMLA.

333.    Ms. Lyons engaged in activity protected by the FMLA when she, *inter alia*: took medical leave (a) in December 2022 for her Achilles tendon, (b) in March 2023 for surgery to treat her endometriosis, (c) in December 2023 when suffering from pelvic spasms, and (d) in January 2024 while recovering from COVID-19.

334.    Defendants took adverse action against Ms. Lyons based on her FMLA-protected absences by, *inter alia*, subjecting her to differential terms and conditions of employment, subjecting her to a hostile environment, and terminating her employment.

335.    As the founder, artistic director and head choreographer of MMDG, Mr. Morris is individually and directly liable as Ms. Lyon's employer. Alternatively, Mr. Morris is individually liable for aiding and abetting MMDG in violating Ms. Lyons' federally protected civil rights.

336.    As a direct and proximate result of Defendants' unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

337.    Defendants' actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Lyons's rights, justifying punitive damages.

338.    Ms. Lyons prays that the Court find Defendants liable for retaliation in violation of the FMLA, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## EIGHTH CAUSE OF ACTION
### Violation of the New York State Human Rights Law
### N.Y. Exec. Law 290 et seq.
### Discrimination
### (Against both Defendants)

339.    Ms. Lyons incorporates each and every allegation of this Complaint as if fully set forth herein.

340.    Ms. Lyons is an Afro-Latina woman who suffers from endometriosis and an autoimmune condition. While employed by Defendants, Ms. Lyons also suffered from a torn Achilles tendon.

341.    Defendants took adverse action against Ms. Lyons based on one or more of these protected statuses by, *inter alia*, subjecting her to differential terms and conditions of employment, subjecting her to a hostile environment, and terminating her employment.

342.    One or more of Ms. Lyons's protected statuses were motivating factors or other sufficient causal factors in Defendants' actions.

343.    As the founder, artistic director and head choreographer of MMDG, Mr. Morris is individually and directly liable as Ms. Lyon's employer. Alternatively, Mr. Morris is individually liable for aiding and abetting MMDG in violating Ms. Lyons' federally protected civil rights.

344.    As a direct and proximate result of Defendants' unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

345.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Lyons's rights, justifying punitive damages.

346.    Ms. Lyons prays that the Court find Defendants liable for discrimination in violation of the NYSHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

**NINTH CAUSE OF ACTION**
**Violation of the New York State Human Rights Law**
**N.Y. Exec. Law 290 et seq.**
**Retaliation**
**(Against both Defendants)**

347.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

348.     Ms. Lyons is an Afro-Latina woman who suffers from endometriosis and an autoimmune condition. While employed by Defendants, Ms. Lyons also suffered from a torn Achilles tendon.

349.     Ms. Lyons engaged in activity protected by the NYSHRL when she, *inter alia*: requested reasonable accommodations in the form of (a) minimizing jumping and turning as her Achilles tendon healed, (b) taking medical leave in December 2022 for her Achilles tendon, (c) going on short term disability leave in March 2023 to complete a major surgery, (d) attending physical therapy one hour per week in the summer of 2023, and (e) taking medical leave for COVID-19 in January 2024.

350.     Ms. Lyons engaged in activity protected by the NYSHRL when she, *inter alia*: (a) reported Mr. Black's dismissal of her medical accommodations to Managing Director Umanoff, (b) told Mr. Morris that his racist joke was not funny, (c) told Mr. Black that she felt punished for taking medical leave, reported Ms. Sahaida's behavior to (d) Mr. Black, (e) HR Business Partner Loyola, and (f) Company Manager Weber, and (g) told Mr. Morris about her protected activities and disparate treatment leading to her termination.

351.     Defendants took adverse action against Ms. Lyons based on her NYSHRL-protected activity by, *inter alia*, subjecting her to differential terms and conditions of employment, subjecting her to a hostile environment, and terminating her employment.

352.     As the founder, artistic director and head choreographer of MMDG, Mr. Morris is individually and directly liable as Ms. Lyon's employer. Alternatively, Mr. Morris is individually liable for aiding and abetting MMDG in violating Ms. Lyons' federally protected civil rights.

353.     As a direct and proximate result of Defendants' unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of

income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

354.    Defendants' actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Lyons's rights, justifying punitive damages.

355.    Ms. Lyons prays that the Court find Defendants liable for retaliation in violation of the NYSHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## TENTH CAUSE OF ACTION
### Violation of the New York City Human Rights Law
### N.Y.C. Admin. Code 8-101 et seq.
### Discrimination
### (Against both Defendants)

356.    Ms. Lyons incorporates each and every allegation of this Complaint as if fully set forth herein.

357.    Ms. Lyons is an Afro-Latina woman who suffers from endometriosis and Undifferentiated Autoimmune Disease ("UD"). While employed by Defendants, Ms. Lyons also suffered from a torn Achilles tendon.

358.    Defendants took adverse action against Ms. Lyons based on one or more of these protected statuses by, *inter alia*, subjecting her to differential terms and conditions of employment, subjecting her to a hostile environment, and terminating her employment.

359.    One or more of Ms. Lyons's protected statuses were motivating factors or other sufficient causal factors in Defendants' actions.

360.    As the founder, artistic director and head choreographer of MMDG, Mr. Morris is individually and directly liable as Ms. Lyon's employer.

361.    Alternatively, Mr. Morris is individually liable for aiding and abetting MMDG in violating Ms. Lyons' federally protected civil rights.

362.    As a direct and proximate result of Defendants' unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

363.    Defendants' actions were intentional, willful, wanton, malicious, and / or reflect a reckless disregard of Ms. Lyons's rights, justifying punitive damages.

364.    Ms. Lyons prays that the Court find Defendants liable for discrimination in violation of the NYCHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

### ELEVENTH CAUSE OF ACTION
**Violation of the New York City Human Rights Law**
**N.Y.C. Admin. Code 8-101 et seq.**
**Retaliation**
**(Against both Defendants)**

365.    Ms. Lyons repeats and realleges the allegations in this Complaint as if fully set forth herein.

366.    Ms. Lyons is an Afro-Latina woman who suffers from endometriosis and Undifferentiated Autoimmune Disease ("UD"). While employed by Defendants, Ms. Lyons also suffered from a torn Achilles tendon.

367.    Ms. Lyons engaged in activity protected by the NYCHRL when she, *inter alia*: requested reasonable accommodations in the form of (a) minimizing jumping and turning as her Achilles tendon healed, (b) taking medical leave in December 2022 for her Achilles tendon, (c)

going on short term disability leave in March 2023 to complete a major surgery, (d) attending physical therapy one hour per week in the summer of 2023, and (e) taking medical leave for COVID-19 in January 2024.

368.    Ms. Lyons engaged in activity protected by the NYCHRL when she, *inter alia*: (a) reported Mr. Black's dismissal of her medical accommodations to Managing Director Umanoff, (b) told Mr. Morris that his racist joke was not funny, (c) told Mr. Black that she felt punished for taking medical leave, reported Ms. Sahaida's behavior to  (d) Mr. Black, (e) HR Business Partner Loyola, and (f) Company Manager Weber, and (g) told Mr. Morris about her protected activities and disparate treatment leading to her termination.

369.    Defendants took adverse action against Ms. Lyons based on her NYCHRL-protected activity by, *inter alia*, subjecting her to differential terms and conditions of employment, subjecting her to a hostile environment, and terminating her employment.

370.    As the founder, artistic director and head choreographer of MMDG, Mr. Morris is individually and directly liable as Ms. Lyon's employer. Alternatively, Mr. Morris is individually liable for aiding and abetting MMDG in violating Ms. Lyons' federally protected civil rights.

371.    As a direct and proximate result of Defendants' unlawful actions, Ms. Lyons has been damaged and continues to suffer damages, including but not limited to deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to her reputation and career.

372.    Defendants' actions were intentional, willful, wanton, malicious, and/or reflect a reckless disregard of Ms. Lyons's rights, justifying punitive damages.

373.    Ms. Lyons prays that the Court find Defendants liable for retaliation in violation of the NYCHRL, and grant all relief permitted by law, as set forth in the Prayer in this Complaint.

## JURY DEMAND

Ms. Lyons respectfully demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Ms. Lyons respectfully requests that this Court grant judgment for her and order the following relief against Defendants:

(1)    A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Ms. Lyons's rights as secured by Section 1981, Title VII, the ADA, the FMLA, the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.;

(2)    Reinstatement to the highest position to which Ms. Lyons was and would be entitled and/or front pay;

(3)    Compensatory damages in the form of:

(a)    back pay with interest based on Ms. Lyons's appropriate compensation had she not been wrongfully terminated;

(b)    reimbursement for social security, experience, training opportunities, and other benefits, in an amount to be proved at trial; and

(c)    damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial;

(d)    damages for future economic loss;

(4)    Liquidated damages and penalties;

(5)    Punitive damages;

(6)    Statutory attorneys' fees, expert fees, costs, and disbursements;

(7)    Interest; and

(8)    Such other and/or further relief as the Court deems just and proper.

Dated: October 22, 2025               Respectfully submitted,
New York, New York

                                      KEENAN & BHATIA, LLC


                                      */s/ Hilary Orzick*
                                      _____

                                      Hilary Orzick
                                      Chloe Liederman
                                      Edward ("E.E.") Keenan
                                      Sonal Bhatia

                                      233 Broadway, Suite 1810
                                      New York, NY 10279
                                      Tel: (212) 470-2560

                                      hilary@keenanfirm.com
                                      chloe@keenanfirm.com
                                      ee@keenanfirm.com
                                      sonal@keenanfirm.com

                                      *Attorneys for Plaintiff Taina Lyons*