USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______________
DATE FILED: 9/18/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TAÍNA LYONS,

Plaintiff,

-against-

DISCALCED, INC., (DBA "MARK MORRIS DANCE GROUP") and MARK MORRIS, individually,

Defendants.

25 Civ. 8689 (AT)

**ORDER**

ANALISA TORRES, District Judge:

In this employment discrimination action, Plaintiff, Taína Lyons, alleges that Defendants, Discalced, Inc. and Mark Morris (collectively, "MMDG"),[1] violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, (Counts I & II)[2]; 42 U.S.C. § 1981 (Counts III & IV); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Counts V & VI); the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Count VII); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law 290 *et seq.* (Counts VIII & IX); and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code 8-101 *et seq.* (Counts X & XI). *See* FAC at 41–56, ECF No. 11. MMDG moves to dismiss the action. *See* Mem., ECF No. 25; Opp., ECF No. 33; Reply, ECF No. 35. The motion is denied.

**BACKGROUND[3]**

Taína Lyons, an Afro-Latina professional dancer, was employed by MMDG from January 20, 2022 to May 21, 2024. FAC ¶¶ 19, 255, 259. MMDG is a "world renowned" dance group founded

[1] Lyons alleges that the corporate defendant and Mark Morris "acted in concert with one another and constitute part of the same overall enterprise, such that the acts of each are the acts of all." FAC ¶ 12. Defendants do not challenge that characterization, *see generally* Mem., ECF No. 25, and the Court accepts for the purposes of this motion that Defendants acted in concert.

[2] Claims under Title VII are brought against the corporate defendant only. *See* FAC at 41–42.

[3] For the purposes of this motion, the Court accepts as true all well-pleaded facts in the FAC and draws all reasonable inferences in Lyons' favor. *See Romanova v. Amilus Inc.*, 138 F.4th 104, 108 (2d Cir. 2025).

by Mark Morris, who serves as artistic director. The *New York Times* has described Morris as "the most successful and influential choreographer alive." *Id.* ¶¶ 1, 10. MMDG's entire leadership team is white. *Id.* ¶ 29. Lyons joined MMDG in January 2022 as its only hire out of 350–400 auditioning dancers, and Mark Morris promoted her from apprentice to a full member of the company after only six months, an unprecedented pace. *Id.* ¶¶ 15, 18–19, 21–22. Lyons was the youngest dancer in the company at 22 years old, the company's first-ever Latina dancer, and the only Black female dancer out of approximately 14 total dancers. *Id.* ¶¶ 24–25.

## I. Environment at MMDG

During her employment, Lyons was subjected to racialized comments and treated less favorably than non-Black dancers. Morris twice criticized Lyons' natural hair during rehearsal as "too big" and a "distraction," ultimately suggesting that she wear a wig, even though non-Black dancers could wear long ponytails without issue. *Id.* ¶¶ 49–51, 134–36. In March 2022, after Lyons changed her hair to a style with cornrows, Morris told her that he was "pro Black hair" and "ha[s] lots of Black friends" but that Lyons would need Morris' permission before changing her hairstyle again. *Id.* ¶¶ 44–45, 47. MMDG did not offer Lyons as much rehearsal time as other dancers. She was the only dancer never provided one-on-one understudy rehearsals and expected to learn roles merely by watching. *Id.* ¶ 54–55. In fall 2023, Morris made a racist joke about a Black singer, and, when Lyons objected, a white dancer Morris favored made a rude face at Lyons. *Id.* ¶¶ 129–131.

These comments occurred in the context of MMDG's pattern of mistreatment of Black employees. During Lyons' first eight months at MMDG, Morris was "on probation, by order of the Board of Directors, for his long history of racist remarks." *Id.* ¶ 32. These remarks included repeatedly calling a Black former MMDG dancer the N-word "on a regular/daily basis," Boyd Decl.

¶ 14, ECF No. 11-1,[4] saying that all Black dancers "look the same," Williams Decl. ¶ 8, ECF No. 11-2, and calling a Black dancer "lazy" for sitting while permitting white dancers to sit, *id.* ¶¶ 10–12. Other members of MMDG leadership made similar remarks. Nancy Umanoff, MMDG's managing director, once criticized a Black dancer's performance by calling it "the hood version" and "suggested that [he] looked like just another [B]lack kid off the street, sagging [his] pants." Boyd Decl. ¶¶ 8–10. Umanoff handled human resources ("HR") complaints for almost two years during Lyons' employment. FAC ¶¶ 30, 77 88. In addition, in 2022 and 2023, MMDG's CFO, Elizabeth Fox, had a "habit of declaring she was [w]hite" or "*just* a [w]hite woman." *Id.* ¶¶ 90, 96, 98. For example, she would repeatedly make comments to the effect of "But what do I know? I'm just a [w]hite woman!" *Id.* ¶¶ 90–91. Lyons experienced this firsthand in spring 2023, when, during an unrelated conversation, Fox asked her, "What do I know? I'm just a *gringa*," using a Spanish term for non-Hispanic women. *Id.* ¶¶ 98–99.

Beyond these repeated racialized remarks, Black MMDG employees report worse conditions of employment than their non-Black counterparts, including in ways that mirror Lyons' experiences. In February 2023, a Black receptionist, McCall Atkinson, formally complained of race discrimination, alleging that "MMDG paid [w]hite receptionists more than Black receptionists for the same work; that MMDG refused to recognize Black History Month while recognizing other affinity months; that MMDG leadership routinely called Black women, including herself, by [other Black women employees'] names; and that [Morris and a white dancer] had been hostile toward her when she guest-danced with the [c]ompany." *Id.* ¶¶ 88–89. Like Lyons, other Black dancers reported receiving inadequate rehearsal time, Boyd Decl. ¶ 6; Williams Decl. ¶¶ 15–16, and being "singled . . . out for especially harsh treatment," FAC ¶ 37. Two Black dancers have also said that Morris

[4] The Court is permitted to consider declarations attached to a complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2016).

physically assaulted them. *See id.* ¶¶ 37–38 (allegation that Morris sexually assaulted a dancer in an elevator); Williams Decl. ¶ 40 (allegation that Morris shoved a dancer in a hallway).

II. Lyons' Medical Conditions and Requested Accommodations

Lyons alleges three medical conditions. She started her employment with pre-existing endometriosis and undifferentiated autoimmune disease ("UAD"),[5] and she suffered a torn Achilles tendon during a performance. FAC ¶¶ 57, 59, 107. As Lyons repeatedly requested accommodations for these conditions, she claims she faced increasing hostility at work.

On September 24, 2022, Lyons injured her Achilles tendon during a performance. *Id.* ¶ 58. The company's in-house physical therapist diagnosed the injury as a "strained" Achilles and advised Lyons "to reduce her jumping and turning as much as possible." *Id.* ¶ 61. In spite of this medical recommendation and Lyons' statements that she "was in a lot of pain and was concerned about further injury," MMDG required Lyons to perform. *Id.* ¶¶ 61–64. Upon learning of Lyons' injury, a close friend of Morris told Lyons that Morris "hates when people are injured." *Id.* ¶ 67. Indeed, Morris appeared unhappy with Lyons at subsequent rehearsals. On one occasion, he "snapped" at Lyons and refused to answer her questions, which he had not done to a dancer before, *id.* ¶ 69–71, and another time he told Lyons to "[g]et used to it" when she said she was in too much pain to complete the steps, *id.* ¶¶ 73–74. Company director Sam Black also regularly changed his mind mid-rehearsal about whether Lyons could abide by medical advice and avoid jumps, at times suddenly "insist[ing] that she fully complete her jumps, regardless of her injury." *Id.* ¶ 76; *see id.* ¶ 117. Lyons met several times with Umanoff about these issues and requested not to perform in the final show of the 2022 season, but Umanoff said "the best [she could] do" was removing Lyons from three

[5] Plaintiff's opposition brief corrects the diagnosis described in the FAC to simultaneous UAD and mixed connective tissue disease. *See* Opp. at 3 n.2. The Court refers only to UAD and endometriosis, because those are the diagnoses alleged in the pleadings. *See generally* FAC.

sections of the ten to fifteen section show. *Id.* ¶¶ 78–79. Lyons "was in so much pain" that she ultimately took ten days of medical leave in December 2022. *Id.* ¶ 81.

In December 2022, Lyons notified MMDG that she would need medical leave for major pelvic abdominal surgery to treat her endometriosis and an associated pre-surgery procedure in March 2023. *Id.* ¶ 84. The surgery was performed on March 10, 2023. *Id.* ¶ 101. Complications arising from the surgery prolonged Lyons' recovery, and she went on short-term disability leave. *Id.* ¶¶ 101–03. When Lyons returned in April 2023, she was prohibited from participating in performances for the next few months. *Id.* ¶¶ 87, 104.

Upon her return, Lyons found that her Achilles tendon had still not healed, so she sought outside medical care and learned that she had suffered not just a strain, but a torn Achilles—"one of the most painful and most dreaded injuries of athletes and dancers." *Id.* ¶¶ 105–08. When she informed company leadership, Umanoff expressed that she "did not like that . . . Lyons saw doctors outside of the [c]ompany," MMDG pressured Lyons to get a second opinion from a company physician not covered by her insurance, and MMDG required Lyons to provide two separate notes from her doctor before excusing her from an upcoming performance. *Id.* ¶¶ 109–13.

In spring 2023, Lyons requested to attend one hour per week of physical therapy for post-surgical and Achilles tendon recovery, but MMDG repeatedly denied her requests, citing a need for "flexibility" in rehearsal scheduling. *Id.* ¶¶ 118–26.

In fall 2023, Fox, the CFO, began insisting that Lyons owed MMDG money related to an "overpayment" for her short-term disability leave, culminating in an "aggressive" encounter where Fox stopped Lyons in the hallway on Lyons' way to rehearsal and accused her of owing MMDG over $2,000. *Id.* ¶¶ 138–41. Because of this encounter, Lyons was three minutes late to rehearsal, causing Morris to reprimand her publicly and Black to reprimand her again by email. *Id.* ¶¶ 143–46.

Umanoff then informed Lyons that she did not owe MMDG money, but warned, "don't ask me for any more favors." *Id.* ¶¶ 147–48.

Lyons states that when she needed to miss work or show up late because of symptoms of her medical conditions or other illnesses, company members and MMDG reacted less favorably to Lyons as compared to other dancers' similar requests. In the FAC, Lyons identifies specific occasions in which company members and leadership disparaged and yelled at her for missing work or coming late due to symptoms of her conditions, even though she witnessed fellow dancers acting the same way without repercussions. *See id.* ¶¶ 155–57, 184–87, 224, 229.

III. <u>Lyons' Discrimination Complaints</u>

In December 2023, Lyons complained to Black in a one-on-one meeting that MMDG was punishing her for taking medical leave and holding her to a double standard. *Id.* ¶¶ 160–64. Black responded by saying that Lyons was "too defensive" and "just like Domingo"—the only other Latino dancer in the company, who was known to argue with and even yell at company leadership in response to criticism. *Id.* ¶¶ 165–68. When Lyons asked for an example of her defensiveness, Black merely "offered that . . . Lyons would sometimes say 'I don't know' in rehearsals." *Id.* ¶ 169. Black also told her "that she needed to be 'more vulnerable,' that her face was 'too stoic' in rehearsals, and that she needed to have more 'pep' in her facial expression whenever . . . Morris was telling a joke or a story in order to 'give [Morris] what he needs.'" *Id.* ¶ 170.

On January 26, 2024, Lyons met with Jessica Loyola, whom MMDG had recently hired to handle HR issues, to file a complaint about a white dancer who had "accosted and berated" Lyons multiple times and called her "girl" when Lyons arrived a few minutes late to call time because she had a flare-up of her UAD. *Id.* ¶ 202; *see also id.* ¶¶ 176, 184–87 (account of white dancer's alleged hostile treatment). Loyola was "extremely cold and hostile" during the meeting, told Lyons it was "not relevant" that she was the only Black woman in the company, "cross-examine[d]" Lyons about

the incident with "rapid-fire questions in a hostile tone," interrupted her when she tried to respond, and generally appeared intent on "intimidat[ing] . . . Lyons and shut[ting] her up." *Id.* ¶¶ 205–13. "When . . . Lyons said she wasn't sure how to move forward . . . Loyola interrupted and said: 'I already have solutions about how to move forward. I'll get back to you.'" *Id.* ¶ 214. Loyola did not communicate with Lyons again until Loyola fired Lyons a few months later. *Id.* ¶ 257.

Lyons also reported a February 24, 2024 incident with the same white dancer to company manager Julia Weber. *Id.* ¶ 251. During the February encounter, the white dancer "became irate" and "antagonize[d]" Lyons when she "politely asked" to be called Taína, not "T." *Id.* ¶¶ 247–48. MMDG did not follow up on the report. *Id.* ¶ 251.

IV. Increasing Tension and Termination

In January 2024, Lyons contracted COVID-19 and took a week of sick leave. *Id.* ¶ 216. When Lyons returned, Black removed her from her lead role in an upcoming dance called "V"; banned her from rehearsal; and required her to "cover" all fourteen roles in "V," for which there were no understudies, in case of emergencies. *Id.* ¶¶ 216–22. On February 6, 2024, Lyons had to serve as a last-minute replacement for a dancer in "V," a role she had never been allowed to rehearse; she had only been able to watch a video of the dance once and complete a short "spacing" rehearsal during which she was prohibited from asking questions. *Id.* ¶¶ 229–33. Lyons "somehow managed to perform [the] role seamlessly" and "received positive feedback on her quick study and show-saving performance from several [c]ompany members." *Id.* ¶¶ 237–38. Nonetheless, Black emailed Lyons to reprimand her afterwards, saying that despite her "ultimately . . . commendable performance," he was "alarmed" at her lack of preparation in the spacing rehearsal—even though Black had never allowed Lyons to rehearse the piece, let alone provided the kind of tailored understudy rehearsal routinely offered to other dancers. *Id.* ¶¶ 239–41. Lyons states that MMDG did not subject non-Black dancers who took sick leave for COVID-19 to similar treatment, *id.* ¶ 219, and has required at

least two other Black dancers to perform roles last-minute without adequate rehearsal time. *See* Boyd Decl. ¶¶ 6–7; Williams Decl. ¶¶ 15–18.

During this same period, Black forced Lyons to perform a full run-through of a different dance, "Castor and Pollux," in rehearsal, even though (1) the [c]ompany physical therapist had informed him that "Castor and Pollux" was too strenuous for Lyons at this stage of her surgical recovery, and (2) Lyons was an understudy not scheduled to perform that night. *Id.* ¶¶ 226–28.

About late April 2024, Lyons experienced a UAD flare-up accompanied by intense body pains and vertigo. *Id.* ¶ 252. Lyons sought medical treatment at urgent care, causing her to miss a rehearsal at the Metropolitan Opera House. *Id.* At the time, she had not taken a day off in two weeks. *Id.*

On May 21, 2024, Black emailed Lyons requesting to speak with her later that day, then led her into Loyola's office. *Id.* ¶¶ 255–56. Loyola told Lyons that MMDG was firing her, even though she was "an extremely talented dancer and had an excellent stage presence" because of "the last couple of months." *Id.* ¶¶ 258–59. Loyola said that Morris had personally decided to fire Lyons. *Id.* ¶ 260.

Lyons had subsequent conversations about her termination with Umanoff and Morris. Umanoff told Lyons that her firing was "definitely not based on [her] ability as a performer or the way [she] deliver[s] Mark's work to the stage"; rather, Lyons "wasn't giving [Morris] 'muse-like inspiration' because the 'magic' wasn't there anymore." *Id.* ¶¶ 267–68. Lyons told Umanoff that she believed she had been treated differently and held to a double standard throughout her time at the company. *Id.* ¶ 269. In response, Umanoff said that Lyons' termination was "handled badly" and that her treatment at MMDG had been "incredibly toxic" and "horrible." *Id.* ¶¶ 270–71. Morris, with whom Lyons was not permitted to meet until July 2024, told her that she was "right" about the

termination being "unfair" and complimented her dancing abilities, saying she would be the "best dancer in any [c]ompany." *Id.* ¶¶ 275–77.

## LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id.* On a motion to dismiss, the Court must draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## DISCUSSION

### I. Race Discrimination (Counts I, III, VIII, & X)

Lyons brings race discrimination and retaliation claims under Title VII, § 1981, the NYSHRL, and the NYCHRL.

#### A. Legal Standards

To defeat a motion to dismiss a Title VII claim, a plaintiff must plausibly allege that "(1) the employer took adverse action against [her] and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). An adverse action is an "injury . . . concerning the terms and conditions of . . . employment." *Cangro v. New York City Dep't of Fin.*, 183 F.4th 149, 161 (2d Cir. 2026)

(cleaned up). The injury need not be significant. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). "Being forced to endure a hostile work environment qualifies as an adverse employment action." *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 670 (S.D.N.Y. 2012). A plaintiff may allege the employer's discriminatory motivation either "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87.

"To establish a claim under 42 U.S.C. § 1981, a plaintiff must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000). Discrimination in employment falls within the scope of § 1981. *See Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004) (explaining that § 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment"). "Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981." *Id.* at 225.[6]

Under the NYSHRL and the NYCHRL, a plaintiff need only allege that she has been treated "less well" because of a protected characteristic. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (NYCHRL); *Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 275 (S.D.N.Y. 2024) (NYSHRL). Federal civil rights statutes serve as a "floor below which the [these statutes] cannot fall." *Mihalik*, 715 F.3d at 110. Therefore, if a plaintiff states a claim for relief under

[6] Differences include that claims under § 1981 need not be asserted within the 180- or 300-day period applicable to Title VII claims and that unlike Title VII claims, § 1981 claims are cognizable against individuals. *See Patterson*, 375 F.3d at 225–26.

Title VII, she "necessarily states a claim under the [NYSHRL and] NYCHRL" as well, *Taylor v. City of New York*, 207 F. Supp. 3d 293, 304 (S.D.N.Y. 2016).[7]

B. Title VII

Lyons has alleged sufficient facts to state a claim for race discrimination under all the statutes on which she relies. The Court begins with Title VII.

1. Adverse Action

Lyons has alleged multiple viable theories of adverse action, including: (1) different terms and conditions of employment based on race, (2) a hostile work environment, and (2) termination.

First, Lyons adequately alleges that she experienced different terms and conditions of employment compared to non-Black dancers. For example, MMDG removed Lyons from a lead role in a production and deprived Lyons of rehearsal time that was available to other dancers, ultimately requiring her to cover fourteen roles without permitting her to rehearse any of them. *See* FAC ¶¶ 54–55, 57, 216–222. Restricting Lyons' rehearsal time "chang[ed] the what . . . and when" of her employment, *Muldrow*, 501 U.S. at 354, and threatened her safety on the job, *see Lopez v. Flight Servs. & Sys., Inc.*, 881 F. Supp. 2d 431, 441 (W.D.N.Y. 2012) (noting that disproportionate exposure to dangerous conditions may constitute adverse action).

Second, the FAC plausibly alleges a hostile work environment. To plead a hostile work environment, a plaintiff must allege facts tending to show that the complained of conduct: (1) is objectively severe or pervasive, (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive, and (3) creates such an environment because of the plaintiff's race. *See La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 209 (2d Cir. 2010). Lyons clearly alleges the

[7] Because *Taylor* analyzes the pre-amendment NYSHRL, it construes the NYSHRL and Title VII together and states that the NYCHRL standard of liability is lower. *See* 207 F. Supp. 3d at 304. The NYSHRL was amended in 2019, and its standard now aligns with the NYCHRL. *See Lee*, 751 F. Supp. 3d at 274–75.

subjective prong, *see* FAC ¶¶ 279–80, and the objective prong is also met.[8] Morris criticized Lyons publicly multiple times for her natural hair and, after stating that he was "pro-Black hair," subjected her to an ongoing restriction that she obtain his permission before changing her hairstyle. *Id.* ¶¶ 47, 49–51, 134–35. Disparaging and restricting a Black woman's natural hair is actionable as racial harassment, particularly when, as here, a defendant expressly links the comments to the plaintiff's race. *See Paupaw-Myrie v. Mount Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 97 n.15 (S.D.N.Y. 2023); *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 (11th Cir. 2016) ("[D]iscrimination on the basis of black hair texture (an immutable characteristic) is prohibited by Title VII."); *Haymon v. Metra*, No. 18 Civ. 848, 2020 WL 1548953, at *12 (N.D. Ill. Mar. 31, 2020) ("[R]acial discrimination claims by Black women on the basis of their hair texture or natural hairstyles are viable, and have been for a long time.").

Morris and Fox both made additional racially charged comments in Lyons' presence. FAC ¶¶ 98–99, 129–131.[9] After Lyons complained that she was being held to a double standard, Black told Lyons that she was "too defensive," "just like [the only other Latino dancer in the company]" and that she was insufficiently "vulnerable" and "too stoic," which—drawing all reasonable inferences in Plaintiff's favor—plausibly evoke the "angry Black woman" racial trope. FAC ¶ 172 & n.5. In the context of these arguably racialized statements and restrictions, Lyons was also singled out for punishment for conduct that she states non-Black dancers would engage in without repercussion, such as being banned from rehearsal and required to cover fourteen roles for taking COVID-19 leave. *See id.* ¶¶ 188, 216–222.

[8] The Court analyzes causation for all theories of adverse action together and does not repeat the analysis here.

[9] Drawing all inferences in Plaintiff's favor, the Court treats Fox's non-sequitur, "What do I know? I'm just a *gringa*," as racially charged, because it appears to be intended to suggest that Lyons, an Afro-Latina woman, would assume Fox was ignorant based on her race and to discredit any grievances Lyons might have about racial discrimination.

Contrary to Defendants' assertions, MMDG's comments go beyond "an isolated and stray remark." Mem. at 7 (quoting *Paupaw-Myrie*, 653 F. Supp. 3d at 98). "There is no threshold magic number of harassing incidents," *Chislett v. New York City Dep't of Educ.*, 157 F.4th 172 (2d Cir. 2025) (citation omitted), and, in this case, Lyons has alleged repeated remarks and less favorable treatment by members of MMDG leadership that a jury could find were motivated by race. Additionally, "[o]n the question of the objectivity of considering [a workplace] hostile and abusive, [the opinions of co-workers are] pertinent." *Id.* As such, Lyons' extensive allegations about other Black employees' experiences of racial harassment and discrimination at MMDG—including Morris' use of the N-word—are not "background and filler" as MMDG suggests, Mem. at 6, but rather support a plausible finding that a hostile work environment existed at MMDG.

Lyons' third viable theory of adverse action is her termination by MMDG. "Termination is a quintessential adverse action." *Philbert v. City of New York*, No. 21 Civ. 3119, 2022 WL 94574, at *22 (S.D.N.Y. Jan. 7, 2022).

2. Causation

Lyons has satisfied her burden of "alleging facts [that] giv[e] rise to a plausible inference of discrimination" as to all three theories of adverse action. *Vega*, 801 F.3d at 87. Lyons need only "show[] that [MMDG] . . . treated [her] less favorably than a similarly situated employee outside [her] protected group" to raise an inference of discrimination. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d. Cir. 2000). She has done so by alleging, *inter alia*, that (1) non-Black dancers were permitted rehearsals as understudies while she was not, FAC ¶ 54, and (2) non-Black dancers were permitted to take COVID-19 sick leave without experiencing punitive consequences culminating in termination, *id.* ¶ 219. *See also id.* ¶ 259 (HR explaining to Lyons in May 2024 that she was fired "based on the last couple of months," after months of hostile actions commencing with Lyons' January 2024 leave for COVID-19).

Lyons' allegations that MMDG leaders have made racist comments to Black employees further supports an inference of discriminatory motivation. For example, she states that Morris called a Black dancer the N-word on a "regular/daily" basis, Boyd Decl. ¶ 14, resulting in Morris' placement on probation by MMDG's Board of Directors, FAC ¶ 32; that MMDG allegedly paid Black receptionists less than white receptionists for the same work, *id.* ¶ 89; that MMDG subjected Black dancers other than Lyons to the same dangerous practice of requiring them to perform last-minute without adequate rehearsal time, Boyd Decl. ¶¶ 6–7; Williams Decl. ¶¶ 15–16; and that Morris physically assaulted multiple Black dancers, FAC ¶¶ 37–38; Williams Decl. ¶ 40. The Court rejects Defendants' characterization of this conduct as "minor insensitivities toward others who share [Lyons'] race." Mem. at 7. Rather, Lyons has alleged "invidious comments about [and actions directed at] others in [her] protected group," and it is well-established that such conduct supports an inference of discriminatory motivation. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

C. Section 1981, NYSHRL, and NYCHRL

The "core substantive standards" that justify denying MMDG's motion to dismiss as to Lyons' Title VII race discrimination claim require the same result under § 1981. *See Patterson*, 375 F.3d at 225; *see also Hargett v. Nat'l Westminster Bank, USA*, 78 F.3d 836, 838–39 (2d Cir. 1996) (applying Title VII analysis to § 1981 claim).

Additionally, Title VII is a "floor below which the [NYSHRL and] NYCHRL cannot fall." *Mihalik*, 715 F.3d at 110. As such, because Lyons has adequately pleaded a Title VII violation, she has adequately pleaded violations of these statutes. *See Taylor*, 207 F. Supp. 3d at 304.

II. Disability Discrimination (Failure to Accommodate) (Count V)

A. Legal Standard

Lyons alleges that MMDG violated the ADA by failing to reasonably accommodate her disabilities. FAC ¶ 317. "A plaintiff states a *prima facie* failure to accommodate claim by demonstrating that [the] (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013) (citation omitted).

B. Discussion

MMDG acknowledges that it was aware of the medical conditions Lyons cites as bases for her failure to accommodate claims. *See* Mem. at 13. To overcome MMDG's motion to dismiss, therefore, Lyons must allege that (1) the medical conditions were qualifying disabilities under the ADA, (2) with reasonable accommodation, she could perform the essential functions of her job, and (3) MMDG did not accommodate her. She has done so.

1. Qualifying Disabilities

Lyons alleges three qualifying disabilities under the ADA. First, Lyons plausibly alleges that her torn Achilles is a disability under the ADA. "The ADA defines 'disability' to include, *inter alia*, 'a physical or mental impairment that substantially limits one or more major life activities.'" *Hamilton v. Westchester County*, 3 F.4th 86, 92 (2d Cir. 2021) (citation omitted); *see* 42 U.S.C.A. § 12102(1)(A). A short-term injury may qualify as a disability for ADA purposes. *See Hamilton,* 3 F.4th at 92–93. Keeping in mind that both the term "major life activity" and the term "substantially limits" are to be construed broadly, 28 C.F.R. § 35.108(c)(2), (d)(1), Lyons has plausibly alleged that her injury substantially interfered with "walking [and] standing . . . and working," *id.*

§ 35.108(c)(1)(i). It limited standing and walking by causing "tremendous" and "constant pain." FAC ¶¶ 59, 72; *see* 28 C.F.R. § 35.108(d)(3)(ii) (when evaluating substantial limitation, courts may consider "pain experienced when performing a major life activity"). The pain persisted even while "taking anti-inflammatories," FAC ¶ 72, indicating that without mitigating medication, the impact would be even more severe. *See also* 28 C.F.R. § 35.108(d)(1)(viii) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures."). The injury additionally limited working in Lyons' trained profession. *See* FAC ¶¶ 59, 72–81, 115–19 (describing limitations on Lyons' ability to dance).

Second, Lyons has plausibly alleged that both her endometriosis and UAD are "episodic" disabilities under the ADA. "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C.A. § 12102(4)(D). A plaintiff's burden to demonstrate that a condition would substantially limit a major life activity when active is not demanding, and she need not allege that episodes are frequent. *See, e.g., Roggenbach v. Touro Coll. of Osteopathic Med.*, 7 F. Supp. 3d 338, 334 (S.D.N.Y. 2014) (holding that even though the plaintiff "ha[d] not attempted to demonstrate that his HIV-positive status has inhibited a major life activity" or caused symptoms on any occasion, a "rational fact finder could conclude" that it would have such effect when active). Lyons' UAD flare-ups have caused heat sensitivity, pain and vertigo, and one flare-up required her to miss work and seek immediate medical care. *See* FAC ¶¶ 57, 174, 252. Similarly, Lyons' endometriosis required major surgery, which, in turn, caused an over one-month short-term disability leave.[10] *See id.* ¶¶ 84, 86, 101–03. She has, therefore, alleged that both conditions, "when active," substantially limit the major life activity of working. *See also Bragdon v.*

[10] Surgical complications are part of a medical condition's impact on major life activities. 28 C.F.R. § 35.108(d)(3)(ii) ("[T]he non-ameliorative effects of mitigating measures … may be considered when determining whether an individual's impairment substantially limits a major life activity.").

*Abbott*, 524 U.S. 624, 660 (1998) (Rehnquist, C.J., concurring in part and dissenting in part) ("There are numerous disorders of the reproductive system, *such as … endometriosis*, which are so painful that they limit a woman's ability to engage in major life activities such as walking and working." (emphasis added)).

2. Ability to Perform Essential Functions with Reasonable Accommodation

Lyons "does not bear a heavy burden" to allege that a reasonable accommodation could permit her to perform essential job functions. *Christina v. Chubb & Son, Inc.,* No. 14 Civ. 1063, 2016 WL 5420564, at *5 (D. Conn. Sept. 27, 2016). She satisfies the required standard. None of her conditions permanently prevented her from meeting the "require[ment] to be physically capable of performing on stage." Mem. at 13. Rather, as discussed below, the accommodations Lyons requested included modified duties for temporary periods, being excused from performing or rehearsing on discrete occasions, and attending medical appointments. *See, e.g.,* FAC ¶¶ 62–64, 74–79, 118–24. All of these are plausibly reasonable accommodations. *See Jeffries v. Verizon*, No. 10 Civ. 2686, 2012 WL 4344188, at *2 (E.D.N.Y. Sept. 21, 2012) ("[R]easonable accommodation may include . . . modification of job duties."); *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 199 (S.D.N.Y. 1999) ("[L]eaves of absence are an appropriate form of reasonable accommodation contemplated by the ADA."); *Barbier v. Raimondo*, 758 F. Supp. 3d 231, 242 (S.D.N.Y. 2024) (providing a flexible schedule to attend medical appointments is a reasonable accommodation). Moreover, MMDG does not dispute that Lyons could perform her essential job functions when adequately accommodated. *See* Mem. 13–14 (arguing that MMDG accommodated Lyons, not that she was incapable of performing with accommodations).

3. MMDG's Failure to Accommodate

Lyons adequately alleges that MMDG refused to accommodate her disabilities. MMDG's primary argument against Lyons' failure-to-accommodate claim is that, because MMDG permitted

her to take medical leave on multiple occasions, "she was in fact accommodated." Mem. 14. This argument ignores Lyons' allegation that she was retaliated against and ultimately fired for taking medical leave. *See Diaz v. City of Mount Vernon*, No. 25 Civ. 05381, 2026 WL 2151240, at *3 (S.D.N.Y. July 27, 2026) (denying motion to dismiss failure-to-accommodate claim in part because, although the defendant did not object in advance to the employee's use of sick leave, it later fired him for taking the leave). Even crediting MMDG's argument that it offered Lyons medical leave, MMDG fails to address Lyons' allegations that MMDG refused to excuse her from work for medical reasons, *see* FAC ¶¶ 62–64, 78–79, prevented her from attending medical appointments, *id.* ¶¶ 122–28, and required her to perform dance moves that threatened her health against medical advice, *id.* ¶¶ 74–76, 226–27. Notably, MMDG mischaracterizes Lyons' allegations of its conduct, highlighting that it removed her from "three sections of [an upcoming] show" while she was injured, without providing the relevant context—that the show was "10-15 total sections." *Compare* Mem. at 13, *with* FAC ¶ 79. At most, MMDG has shown that "[w]hether a reasonable accommodation was denied requires factual development of the record," making "dismissal of this claim at the pleading stage . . . inappropriate." *Diaz*, 2026 WL 2151240, at *3; *see also Santos v. City of New York*, No. 01 Civ. 120, 2001 WL 1568813, at *6 (S.D.N.Y. Dec. 7, 2001) ("[B]ecause the [c]omplaint contains allegations of both denial and delay in response to [plaintiff's] requests for medical leave, her failure to accommodate claim is not subject to resolution on a motion to dismiss."). Lyons has, therefore, met her burden with respect to all prongs of her failure-to-accommodate claim, and MMDG's motion to dismiss this cause of action is denied.

III. Disability Discrimination (Counts V, VIII, & X)

A. Legal Standard

Lyons also brings claims for disability discrimination under the ADA, the NYSHRL, and the NYCHRL.

"The elements of a [discrimination] claim under the ADA are that: (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (quoting 42 U.S.C. § 12102(1)(A)). The substantial limitation requirement "is not meant to be a demanding standard." *Hamilton*, 3 F.4th at 92 (quoting 28 C.F.R. § 35.108(d)(1)(i)). To demonstrate that the adverse action was "because of" her disability at the pleading stage, "a plaintiff need only give plausible support to a minimal inference of discriminatory motivation." *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015) (quoting *Vega*, 801 F.3d at 84).

The standard for disability discrimination under the NYCHRL and NYSHRL is the same as for race discrimination: The plaintiff must show she was treated "less well" because of her disability. *Mihalik*, 715 F.3d at 110; *see also Martinez v. Staten Island Univ. Hosp*., 814 F. Supp. 3d 380, 401–02 (E.D.N.Y. 2026) (explaining impact of 2019 amendment of NYSHRL for disability discrimination). Both statutes define "disability" more broadly than the ADA, without requiring any showing that the disability substantially limits a major life activity. *Arazi v. Cohen Bros. Realty Corp.*, 20 Civ. 8837, 2022 WL 912940, at *7 (S.D.N.Y. Mar. 28, 2022). As with race discrimination claims, district courts must treat federal civil rights statutes proscribing disability discrimination as a floor, not a ceiling, when interpreting state and city law. *Mihalik*, 715 F.3d at 109 (internal quotation marks and citation omitted).

B. ADA

The Court begins with Lyons' ADA discrimination claim. The Court has already concluded that Lyons has alleged qualifying disabilities and multiple adverse actions. Furthermore, MMDG concedes that Lyons was qualified for her role. The only remaining element is, therefore, whether any of the adverse actions Lyons alleged occurred "because of" Lyons' disabilities.

"[A]n inference of discrimination can . . . be drawn from an employer's failure to provide reasonable accommodations." *Nakis v. Potter*, 422 F. Supp. 2d 398, 422 (S.D.N.Y. 2006). As explained above, Lyons has plausibly alleged that MMDG did not provide reasonable accommodations. Additionally, "[a]n inference of discrimination can arise from circumstances including, but not limited to . . . the more favorable treatment of employees not in the protected group[] or the sequence of events leading to the [adverse action.]" *Littlejohn*, 795 F.3d at 312. Accepting the facts alleged in the FAC as true, MMDG consistently responded with hostility to Lyons' disability-related requests and limitations. *See, e.g.*, ¶¶ 69–74 (alleging that Morris "snapped" at Lyons, refused to answer her questions, and told her to "get used to" the pain after she injured her Achilles tendon); *id.* ¶ 87 (alleging that MMDG barred Lyons from performing after she returned from her endometriosis surgery); *id.* ¶ 188 (alleging that MMDG's company manager reprimanded Lyons for lateness following a UAD flare-up but did not reprimand a non-disabled dancer who arrived at the same time); *id.* ¶¶ 110–11 (stating that Umanoff expressed that a torn Achilles "should have healed by now" and that she disapproved of Lyons seeing doctors outside the company).

The sequence of events immediately prior to two relevant adverse actions—the 2024 restrictions on Lyons' rehearsal time and her ultimate termination—further strengthen the inference of discrimination. MMDG removed Lyons from her lead role in an upcoming dance and required her to cover fourteen roles without rehearsal after she returned from sick leave for COVID-19 in February 2024, measures they had not imposed on non-disabled dancers who took COVID-19 leave.

*Id.* ¶¶ 216–20. After Lyons took an additional sick day in April 2024 because of a UAD flare-up, MMDG fired Lyons in May 2024 "based on the last couple of months." *Id.* ¶¶ 252, 59; *see also Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 437 (E.D.N.Y. 2015) ("[T]emporal proximity is sufficient to raise an inference of discrimination." (citation omitted)).

MMDG argues that its knowledge of Lyons' UAD and endometriosis at the time she was hired "undercuts any theory" of disability discrimination based on these conditions. *See* Mem. at 13 ("If Lyons had [the conditions] at the time she was hired, it cannot be inferred that she was fired because of them."). The fact that the same actor both hired and fired a discrimination plaintiff "should not . . . be used to foreclose claims 'at the motion-to-dismiss stage if the plaintiff has otherwise set forth allegations that support a plausible inference of discrimination.'" *Diaz*, 2026 WL 2151240, at *3 (quoting *Buon v. Spindler,* 65 F.4th 64, 85 (2d Cir. 2023)). The pleading contains facts indicating that MMDG was hostile toward Lyons whenever her preexisting conditions required accommodation; MMDG's argument, therefore, is premature. Moreover, hiring an employee with disabilities, then expecting that employee to perform in the same way as her able-bodied colleagues, does not preclude an inference of discrimination.

Because Lyons has raised a plausible inference of discrimination with respect to (1) changes in her terms and conditions of employment beginning in February 2024, and (2) her May 2024 firing, MMDG's motion to dismiss her ADA discrimination claim is denied.

### C. NYSHRL and NYCHRL

Because Lyons states a claim for disability discrimination under the ADA, she necessarily states a claim for discrimination under the NYSHRL and NYCHRL. *Dixon v. City of New York*, No. 23 Civ. 8941, 2025 WL 50140, at *12 (S.D.N.Y. Jan. 7, 2025). The motion to dismiss is, therefore, denied as to Lyons' disability discrimination claims under these statutes.

IV. Retaliation (Counts II, IV, VI, VII, IX, & XI)

Lyons alleges retaliation in violation of Title VII, § 1981, the ADA, the FMLA, the NSYHRL, and the NYCHRL.

A. Legal Standards

Retaliation claims under Title VII, § 1981, and the ADA are subject to substantively similar standards. *See Mitchell v. Planned Parenthood of Greater New York, Inc*., 745 F. Supp. 3d 68, 103 (S.D.N.Y. 2024) (noting that Title VII and § 1981 are "subject to the same standards"); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (observing that ADA retaliation provision is "substantially similar to the retaliation prohibition in Title VII"). To state a claim for retaliation under these statutes, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse action; and (4) there was a causal connection between the protected activity and that adverse action. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C*., 716 F.3d 10, 14 (2d Cir. 2013); *see also Littlejohn*, 795 F.3d at 315; *Vale*, 80 F. Supp. 3d at 438. Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination." *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d Cir. 2012) (citation omitted); *see also Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 226–27 (E.D.N.Y. 2018) (analyzing § 1981). For ADA purposes, protected activity includes making requests for reasonable accommodation. *See Vale*, 80 F. Supp. 3d at 439. "[T]he allegations in the complaint need only give plausible support" to these elements to survive a motion to dismiss. *Littlejohn*, 795 F.3d at 316. Title VII, § 1981, and ADA retaliation claims require showing that retaliation was the "but-for" cause of the adverse action, not merely that it was a motivating factor. *See Santiago v. ACACIA Network, Inc.*, No. 22 Civ. 228, 634 F. Supp. 3d 143, 156 (S.D.N.Y. 2022); *Mehta v. City of New York*, 19 Civ. 3857, 2022 WL 280460, at *7 (E.D.N.Y. Jan. 31, 2022).

The elements of a FMLA retaliation claim largely overlap. "To state a claim for retaliation under the FMLA, Plaintiff must allege that: '1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.'" *Smith v. Westchester County*, 769 F. Supp. 2d 448, 469 (S.D.N.Y. 2011) (quoting *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)). The "application for and use of FMLA leave" is an exercise of rights protected under the FMLA. *Id.* at 470. The Second Circuit has held that "a 'motivating factor' causation standard applies to [FMLA retaliation] claims." *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 166 (2d Cir. 2017).

Retaliation claims under the NYSHRL and NYCHRL are subject to a more permissive standard. *See Lee*, 751 F. Supp. 3d at 284. "[T]he plaintiff must show that she took an action opposing her employer's discrimination . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112. The protected activity need only be a "motivating factor" in the employer's action, not its "but-for" cause, as would be required under Title VII, § 1981, and the ADA. *Id.*; *see also Lee*, 751 F. Supp. 3d at 284–85 (applying the same standard to the NYCHRL and post-2019 NYSHRL).

The Court turns to Lyons' retaliation claims under each statute.

B. Title VII and § 1981

Lyons adequately alleges that she engaged in protected activity under Title VII and § 1981 and that, because of her protected activity, MMDG engaged in actions that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). For example, Lyons alleges that she "filed a formal HR complaint" identifying discriminatory treatment and noting that she was "the only Black woman in the [c]ompany." FAC ¶¶ 202–08. In response, Loyola, the HR representative, told Lyons that her

race was "not relevant" and "began cross-examining her," apparently attempting "to intimidate" Lyons. *Id.* ¶¶ 211–13. At the end of the conversation, Loyola told Lyons, "I already have solutions about how to move forward. I'll get back to you." *Id.* ¶ 214. The next time Lyons saw Loyola was when Loyola told Lyons she was fired, which MMDG leadership indicated was "definitely not based on [Lyons'] ability as a performer" but instead resulted from Morris' feeling that the "magic" was missing. *Id.* ¶¶ 257, 267–68; *see also Johnson v. Rockland County BOCES*, No. 21 Civ. 2275, 2022 WL 4538452, at *16 (S.D.N.Y. Sept. 28, 2022) ("[V]agueness [in a termination explanation] contributes to [an] inference of discrimination."). In addition, Black removed Lyons from her lead dance role and required her to cover fourteen roles without rehearsal just ten days after she made her HR complaint. *Id.* ¶¶ 202, 217–18, 239–41. Taken together, these allegations "give plausible support" to the claim that MMDG retaliated against Lyons for opposing prohibited racial discrimination. *See Littlejohn*, 795 F.3d at 316.

C. ADA and FMLA

The Court analyzes Lyons' ADA and FMLA retaliation claims together because the elements at issue are largely the same for both causes of action. Defendants do not dispute that Lyons was qualified for her position, *see* Mem. 22–23, or that Lyons engaged in protected activity for the purposes of both statutes. *Id.*; *see id.* at 14 (arguing that MMDG provided reasonable accommodations by allowing Lyons to take medical leave); *see also Vale*, 80 F. Supp. 3d at 439 (noting that requesting a reasonable accommodation is protected activity).

Lyons states a claim for retaliation under the ADA and the FMLA because her allegations raise a plausible inference that MMDG retaliated against her for taking medical leave, including by ultimately firing her. After Lyons' short-term disability leave for endometriosis, she was prohibited from performing for months, FAC ¶ 87, pressured to pay MMDG $2,000 for an unexplained benefits overpayment, *id.* ¶¶ 138–42, and more generally, "held to a double standard compared to other

dancers, belittled and singled out for blame." *Id.* ¶¶ 163–64. For example, in February 2024, immediately after returning from leave for COVID-19, Lyons was removed from a lead role, required to cover fourteen roles without being permitted to rehearse them, and then reprimanded for being inadequately prepared to fill in last-minute despite her admittedly "commendable" performance. *Id.* ¶¶ 216–41. Lyons took one more day of sick leave in April 2024 during a UAD flare-up. *Id.* ¶ 254. She was fired the next month, and MMDG's HR representative told her that the termination was "based on the last couple of months" and not on her skills as a dancer. *Id.* ¶¶ 258–59. Taken together, these allegations support an inference of retaliation.

D. NYSHRL and NYCHRL

"Because interpretations of . . . federal civil rights statutes can serve only as a floor below which the [NYSHRL and NYCHRL] cannot fall, the above conduct found actionable under Title VII, [§] 1981, [the ADA, and the FMLA] is necessarily actionable under the NYCHRL and under the NYSHRL." *Lee*, 751 F. Supp. 3d at 284–85. Lyons, therefore, also states a claim for retaliation under the NYSHRL and the NYCHRL.

## CONCLUSION

Accordingly, Defendants' motion to dismiss is DENIED in its entirety. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 23.

SO ORDERED.

Dated: September 18, 2026
New York, New York

ANALISA TORRES
United States District Judge